# UNITED STATES v. WINONA AND ST. PETER RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH
CIRCUIT.

No. 321.    Argued November 30, December 1, 1896. — Decided February 15, 1897.

In view of the fact that many years have passed since the certification of
the lands in controversy, and since the railroad company, in reliance
upon the title which it believed it had acquired, disposed of them, and
that other parties have become interested in them, and have dealt with
them as private property, the appellees are justified in saying that they
have large claims upon the equitable consideration of the courts.

The act of March 3, 1887, 24 Stat. 556, providing for the adjustment of
land grants made by Congress to aid in the construction of railroads,
and the act of March 2, 1896, 29 Stat. 42, operated to confirm the title
to purchasers from a railroad company of lands certified or patented to or
for its benefit, notwithstanding any mere errors or irregularities in the
proceedings of the land department, and notwithstanding the fact that
the lands so certified or patented were, by the true construction of the
land grants, although within the limits of the grants, excepted from their
operation; provided that they purchased in good faith, and paid value
for the lands; and provided, also, that the lands were public lands in the
statutory sense of the term, and free from individual or other claims.

THIS was a bill in equity filed by the United States in the
Circuit Court for the District of Minnesota under authority of
the act of Congress of March 3, 1887, c. 376, 24 Stat. 556, pro-
viding for the adjustment of land grants made by Congress to
aid in the construction of railroads, and for the forfeiture of
unearned lands, etc.    The charge was that the lands specified
in the bill had been wrongfully certified to the State of
Minnesota for the benefit of the defendant company, and the
prayer was for a cancellation of such certification and a resto-
ration of the lands to the public domain.    After answers by
the railroad company and some of the other defendants an
agreed statement of facts was prepared, upon which, with the
pleadings, the case was submitted to the Circuit Court for
decision.    Upon hearing a decree was entered dismissing the

bill, which thereafter was affirmed by the Circuit Court of Appeals for the Eighth Circuit. 32 U. S. App. 272.

By the agreed statement the following facts appear, and upon them the rights of the parties depend: On March 3, 1857, Congress passed an act, c. 99, 11 Stat. 195, granting to Minnesota to aid in the building of certain lines of railroad the alternate odd-numbered sections for six sections in width on each side of the line of each road. The amount of this grant was increased by the act of March 3, 1865, c. 105, 13 Stat. 526, to ten sections per mile. By appropriate state legislation the defendant railroad company became one of the beneficiaries of this grant. It duly constructed its road, and the construction was accepted and approved. The, lands in controversy were within the limits and terms of the grant, and were certified to the State nearly all in the years 1872, 1873, 1874 and 1875, though two tracts were not so certified until the year 1879. At the time of the filing by the railroad company of its map of definite location there were on the records and files of the Land Office homestead entries or preemption filings upon these lands, regular in form and *prima facie* valid, some of them having been made intermediate the time that the line of the railroad was surveyed, staked out and marked on the face of the earth and the date of the filing of the map of definite location, and some having been made prior to the first-named time. Proceedings were had in the General Land Office, after proper notice by publication, by which all these entries and filings were duly cancelled prior to the certification of the lands to the State of Minnesota. The cancellations were generally on the ground of abandonment, and from the time thereof up to the filing of the agreed statement of facts, July 26, 1893, none of the persons who had made such homestead entries or preemption filings had ever made any claim to the lands, so far as shown by the records of the land department. The railroad company sold and conveyed the lands to parties who paid value and bought believing that the company's title was unimpeachable. Further, after the patent from the State the lands were subjected to taxation, and the land company, the grantee from

the railroad company of most of these lands, alone paid over $8000 of taxes while it held the title. It was not pretended that the amount of lands certified for the benefit of the defendant railroad company (including therein the lands in controversy) exceeded the grant. In other words, it was not claimed that the railroad company ever got more lands than it was entitled to, but only that these particular tracts were wrongly certified to it.

It was also admitted "that on, before and for a long time after the certification of the lands in question to the State on account of the railroad grants it was uniformly held and ruled by the Secretary of the Interior and the other officers of the land department of the United States: (*a*) That the line of a railroad became and was definitely fixed so as to attach the grant to the odd-numbered sections within the granted limits as soon as surveyed, staked out and marked on the face of the earth; and (*b*) That a homestead entry in all respects regular and legal excepted the land covered thereby from the operation of a railroad grant attaching during the existence of such entry; that the validity of a homestead entry was open to question by the company, and if it was shown that such entry was fraudulent or irregular in its inception, or that it had been abandoned before the right of the road attached, it was held not to except the land from the grant, but the burden of so showing was upon the company, and, in the absence of such proof, the entry being valid upon its face, was held to except the land from the grant, even though subsequently abandoned; and (*c*) That a preëmption claim, which may have existed to a tract of land at the time of the attachment of a railroad grant, if subsequently abandoned, and not consummated, even though in all respects legal and *bona fide*, was held not to operate to defeat the grant, but, upon the failure of such claim, the land covered thereby was held to inure to the grant as of the date when such grant became effective; and (*d*) That the rights under the grant attached to the lands in the granted and indemnity limits as of the same date, and that selection was not deemed necessary to attach the grant to any specific tract within the indemnity

limits; and (*e*) That the lands within the indemnity limits were withdrawn at the same time as those within the primary or granted limits; and (*f*) That within the common limits of like character of two contemporaneous grants each was held to be entitled to an undivided moiety of the lands within such common limits; and (*g*) That in pursuance of and in accordance with the aforesaid rules, the grants to and for each and all of the land-grant railroad companies in the State of Minnesota were, before, at and for a long time after the certification of the lands in question, administered."

The act of March 3, 1887, is found printed below.[1]

---

[1] *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Secretary of the Interior be and is hereby authorized and directed to immediately adjust, in accordance with the decisions of the Supreme Court, each of the railroad land grants made by Congress to aid in the construction of railroads and heretofore unadjusted.

SEC. 2. That if it shall appear, upon the completion of such adjustments respectively, or sooner, that lands have been, from any cause, heretofore erroneously certified or patented by the United States to or for the use or benefit of any company claiming by, through or under grant from the United States to aid in the construction of a railroad, it shall be the duty of the Secretary of the Interior to thereupon demand from such company a relinquishment or reconveyance to the United States of all such lands, whether within granted or indemnity limits; and if such company shall neglect or fail to so reconvey such lands to the United States within ninety days after the aforesaid demand shall have been made, it shall thereupon be the duty of the Attorney General to commence and prosecute in the proper courts the necessary proceedings to cancel all patents, certification, or other evidence of title heretofore issued for such lands, and to restore the title thereof to the United States.

SEC. 3. That if, in the adjustment of said grants, it shall appear that the homestead or preëmption entry of any *bona fide* settler has been erroneously cancelled on account of any railroad grant or the withdrawal of public lands from market, such settler upon application shall be reinstated in all his rights and allowed to perfect his entry by complying with the public land laws: *Provided*, That he has not located another claim or made an entry in lieu of the one so erroneously cancelled: *And provided also*, That he did not voluntarily abandon said original entry: *And provided further*, That if any of said settlers do not renew their application to be reinstated, within a reasonable time, to be fixed by the Secretary of the Interior, then all such unclaimed lands shall be disposed of under the public land laws, with priority of right given to *bona fide* purchasers of said unclaimed lands, if any:

After the passage of that act, and on March 3, 1891, Congress passed an act (26 Stat. 1093) containing this provision: "That suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents." And

---

and if there be no such purchasers, then to *bona fide* settlers residing thereon.

SEC. 4. That as to all lands, except those mentioned in the foregoing section, which have been so erroneously certified or patented as aforesaid, and which have been sold by the grantee company to citizens of the United States, or to persons who have declared their intention to become such citizens, the person or persons so purchasing in good faith, his heirs or assigns, shall be entitled to the land so purchased, upon making proof of the fact of such purchase at the proper land office, within such time and under such rules as may be prescribed by the Secretary of the Interior, after the grants, respectively, shall have been adjusted; and patents of the United States shall issue therefor, and shall relate back to the date of the original certification or patenting, and the Secretary of the Interior, on behalf of the United States, shall demand payment from the company which has so disposed of such lands of an amount equal to the Government price of similar lands; and in case of neglect or refusal of such company to make payment, as hereafter specified, within ninety days after the demand shall have been made, the Attorney General shall cause suit or suits to be brought against such company for the said amount: *Provided,* That nothing in this act shall prevent any purchaser of lands erroneously withdrawn, certified or patented as aforesaid from recovering the purchase money therefor from the grantee company, less the amount paid to the United States by such company as by this act required: *And provided,* That a mortgage or pledge of said lands by the company shall not be considered as a sale for the purpose of this act, nor shall this act be construed as a declaration of forfeiture of any portion of any land grant for conditions broken, or as authorizing an entry for the same, or as a waiver of any rights that the United States may have on account of any breach of said conditions.

SEC. 5. That where any said company shall have sold to citizens of the United States, or to persons who have declared their intention to become such citizens, as a part of its grant, lands not conveyed to or for the use of such company, said lands being the numbered sections prescribed in the grant, and being coterminous with the constructed parts of said road, and where the lands so sold are for any reason excepted from the operation of the grant to said company, it shall be lawful for the *bona fide* purchaser thereof from said company to make payment to the United States for said

on March 2, 1896, Congress passed a still further act, c. 39, 29
Stat. 42, which is also found in the foot-note.[1]

---

lands at the ordinary Government price for like lands, and thereupon pat-
ents shall issue therefor to the said *bona fide* purchaser, his heirs or assigns :
*Provided*, That all lands shall be excepted from the provisions of this sec-
tion, which at the date of such sales were in the *bona fide* occupation of
adverse claimants under the preëmption or homestead laws of the United
States, and whose claims and occupation have not since been voluntarily
abandoned, as to which excepted lands the said preëmption and homestead
claimants shall be permitted to perfect their proofs and entries, and receive
patents therefor : *Provided further*, That this section shall not apply to
lands settled upon subsequent to the first day of December, eighteen hundred
and eighty-two, by persons claiming to enter the same under the settlement
laws of the United States, as to which lands the parties claiming the same
as aforesaid shall be entitled to prove up and enter as in other like cases.

SEC. 6. That where any such lands have been sold and conveyed, as the
property of any railroad company, for the state and county taxes thereon,
and the grant to such company has been thereafter forfeited, the purchaser
thereof shall have the prior right, which shall continue for one year from
the approval of this act, and no longer, to purchase such lands from the
United States at the Government price, and patents for such lands shall
thereupon issue : *Provided*, That said lands were not, previous to or at the
time of the taking effect of such grant, in the possession of or subject to
the right of any actual settler.

SEC. 7. That no more lands shall be certified or conveyed to any State
or to any corporation or individual, for the benefit of either of the com-
panies herein mentioned, where it shall appear to the Secretary of the Inte-
rior that such transfers may create an excess over the quantity of lands to
which such State, corporation or individual would be rightfully entitled.

[1] *Be it enacted by the Senate and House of Representatives of the United
States of America in Congress assembled*, That suits by the United States to
vacate and annul any patent to lands heretofore erroneously issued under a
railroad or wagon road grant shall only be brought within five years from
the passage of this act, and suits to vacate and annul patents hereafter is-
sued shall only be brought within six years after the date of the issuance
of such patents, and the limitation of section eight of chapter five hundred
and sixty-one of the acts of the second session of the Fifty-first Congress
and amendments thereto is extended accordingly as to the patents herein
referred to. But no patent to any lands held by a *bona fide* purchaser shall
be vacated or annulled, but the right and title of such purchaser is hereby
confirmed : *Provided*, That no suit shall be brought or maintained, nor shall
recovery be had for lands or the value thereof, that were certified or pat-
ented in lieu of other lands covered by a grant which were lost or relin-
quished by the grantee in consequence of the failure of the Government or
its officers to withdraw the same from sale or entry.

*Mr. Solicitor General* for appellants.

The certification, by the Secretary of the Interior, to the

SEC. 2. That if any person claiming to be a *bona fide* purchaser of any lands erroneously patented or certified shall present his claim to the Secretary of the Interior prior to the institution of a suit to cancel a patent or certification, and if it shall appear that he is a *bona fide* purchaser, the Secretary of the Interior shall request that suit be brought in such case against the patentee, or the corporation, company, person or association of persons for whose benefit the certification was made, for the value of said land, which in no case shall be more than the minimum Government price thereof, and the title of such claimant shall stand confirmed. An adverse decision by the Secretary of the Interior on the *bona fides* of such claimant shall not be conclusive of his rights, and if such claimant, or one claiming to be a *bona fide* purchaser, but who has not submitted his claim to the Secretary of the Interior, is made a party to such suit, and if found by the court to be a *bona fide* purchaser, the court shall decree a confirmation of the title, and shall render a decree in behalf of the United States against the patentee, corporation, company, person or association of persons for whose benefit the certification was made for the value of the land as hereinbefore provided. Any *bona fide* purchaser of lands patented or certified to a railroad company, and who is not made a party to such suit, and who has not submitted his claim to the Secretary of the Interior, may establish his right as such *bona fide* purchaser in any United States court having jurisdiction of the subject-matter, or at his option, as prescribed in sections three and four of chapter three hundred and seventy-six of the acts of the second session of the Forty-ninth Congress.

SEC. 3. That if at any time prior to the institution of suit by the Attorney General to cancel any patent or certification of lands erroneously patented or certified a claim or statement is presented to the Secretary of the Interior by or on behalf of any person or persons, corporation or corporations, claiming that such person or persons, corporation or corporations, is a *bona fide* purchaser or are *bona fide* purchasers of any patented or certified land by deed or contract, or otherwise, from or through the original patentee or corporation to which patent or certification was issued, no suit or action shall be brought to cancel or annul the patent or certification for said land until such claim is investigated in said Department of the Interior; and if it shall appear that such person or corporation is a *bona fide* purchaser as aforesaid, or that such persons or corporations are such *bona fide* purchasers, then no such suit shall be instituted and the title of such claimant or claimants shall stand confirmed; but the Secretary of the Interior shall request that suit be brought in such case against the patentee, or the corporation, company, person or association of persons for whose benefit the patent was issued or certification was made for the value of the land as hereinbefore specified.

State of Minnesota of the lands described in the bill of complaint, for the benefit of the Winona and St. Peter Railroad Company, after homestead and preëmption rights had attached to such lands and while the lands were still covered by these entries, was an act not merely voidable, but absolutely void, because control over and power of disposition of said lands by the Interior Department had ceased. *United States* v. *Stone*, 2 Wall. 525; *Maxwell Land Grant case*, 121 U. S. 325; *Hastings & Dakota Railroad* v. *Whitney*, 132 U. S. 357; *Whitney* v. *Taylor*, 158 U. S. 85; *Weeks* v. *Bridgman*, 159 U. S. 541; *Burfenning* v. *Chicago & St. Paul Railway*, 163 U. S. 321, 323, where the court said: "But it is also equally true that when by act of Congress a tract of land has been reserved from homestead and preëmption, or dedicated to any special purpose, proceedings in the land department in defiance of such reservation or dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the land department cannot override the expressed will of Congress or convey away public lands in disregard or defiance thereof."

The present suit (No. 321) is between the United States and the Winona company, which holds the lands and refuses to relinquish them. Its claims must stand or fall upon the acts in its aid, and it is sufficient for this case to determine that the lands in dispute were not included in the grants in aid of the Winona road. What becomes of them after they are recovered by the United States is a matter of no concern whatever to the Winona company. *United States* v. *Southern Pacific Railroad*, 146 U. S. 570, 604.

The lands were by mistake certified in aid of the Sioux City road. The legal effect of that certification was, as this court has determined, to convey them for the use and benefit of the Winona company.

The Secretary of the Interior, under whose direction this suit was instituted, in proceeding to adjust the grants in aid of the Winona road, found these lands in the possession of the Winona company, claimed by it under its grants, and that company cannot shield itself from the operation of the adjust-

ment·act and of its own granting acts, by insisting that these lands fell, or were certified to the Sioux City road.

We submit that a proper construction of the granting acts in aid of the two roads does not sustain the position·taken by the Winona company.

The courts have uniformly construed these grants strictly against the grantee companies. They are never extended beyond the scope of their express provisions, and wherever the question as to reservations and exceptions has arisen, or there appear conflicting claims between two or more companies, great care ·has·been exercised to exclude from grants lands which have been reserved, appropriated or devoted to another purpose by every reasonable construction in favor of such reservation, on the theory that it has been the evident intention and purpose of Congress, in all such grants, to limit them in their operation to such lands only as the United States had the clear and unquestioned right to convey at the time without disturbing existing relations or producing vexatious conflicts. *Bardon* v. *Northern Pacific Railroad*, 145 U. S. 535, 543; *United States* v. *Missouri, Kansas & Texas Railway*, 141 U. S. 358, 368, 374; *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733; *United States* v. *Northern Pacific Railroad*, 152 U. S. 284, 296.

If, then, at the time of the certification by the Secretary of these lands to the State of Minnesota, the line of definite location of the railroad had not been fixed by filing the maps in the office of the Secretary of the Interior, no title whatever vested in the railroad, even 'under a grant by the governor of Minnesota of such land. And if at the time of the filing of such map homestead and preëmption rights had already attached, then these were excepted from such grant.

The power is lodged with the Secretary of the Interior to ascertain and determine facts upon the existence of which may depend the conveyance by him of title to public lands of the United States. His determination of such facts is final and conclusive. But it is going entirely too far to insist, as is done here by counsel for appellee, that the determination as to whether one is or is not a *bona fide* purchaser from or

under the United States is a fact which the Secretary of the Interior may conclusively establish and determine.

Whether one is such a purchaser or not may — and in this case in large measure does — depend upon the existence of power in the Secretary to convey such lands. For one cannot be a *bona fide* purchaser unless he from whom he purchase have power to sell.

The Secretary cannot be the judge of the existence and extent of the powers which he assumes to exercise. In no aspect of this case can it be claimed that the State of Minnesota, or the railroad company, or the land company, or the purchasers from either, were purchasers without notice. As we have already shown, the act itself gave notice of the reservation in favor of homestead and preëmption claimants. The records of the land offices, both local and general, afforded notice of the existence of the homestead and preëmption entries; and also of the official communication from Hendricks, Commissioner of the General Land Office, to the Governor of Minnesota, of July 21, 1857, that the title of the Territory would not rest under the land grant until the maps of definite location were filed in the office of the Secretary of the Interior.

All these not only put subsequent purchasers upon inquiry, but actually afforded full and complete notice of the outstanding equitable rights of the homestead and preëmption entrymen.

We submit that the question of *bona fide* purchasers cannot properly arise in this case, brought under the act of March 3, 1887. The only object of proceedings under that act being to have declared void the certification of lands under railroad grants, if upon the facts proven the court should be satisfied that the lands were certified without authority of law.

*Mr. Thomas Wilson* for appellees.

*Mr. J. A. Tawney* and *Mr. H. M. Lamberton* filed a brief or the Winona and St. Peter Land Company, appellee.

Mr. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

There are other matters disclosed in the record, such as the claim at one time asserted by the St. Paul and Sioux City Railroad Company to these lands or a part of them; the litigation between the two companies, and the final decision by this court; also certain transactions between the railroad company and a land company and the litigation resulting therefrom, together with a series of conveyances by the railroad and the land company of the lands. But in view of the conclusions to which we have come upon the facts stated, we deem it unnecessary to cumber the record with any detailed mention of those matters.

These facts appear: *First.* The railroad company has constructed its road and has earned the land grant. *Second.* It has received no more land than Congress by the act referred to proposed to grant to aid in the construction of the road. *Third.* At the time that the lands were certified to the State for its benefit they were not subject to any homestead or preëmption entry. They were free from all claims other than those of the railroad company itself, and were, except as subject to such claims, in the fullest sense public lands and within the jurisdiction of the land department. *Fourth.* Up to March 2, 1885 (when *Kansas Pacific Railway Company* v. *Dunmeyer,* 113 U. S. 629, was decided by this court), the uniform ruling of the land department had been that the title to railroad lands became settled at the time the line of the railroad was surveyed, staked out and marked on the face of the earth, and not at the time of the filing of the map of definite location in the land department; that a homestead entry, though apparently regular and valid, was open to question by the railroad company, and it shown to have been fraudulent or irregular in inception, or that it had been abandoned before the right of the company attached, was held not to except the land from the grant; and also that a preëmption claim existing at the time of the attaching of a railroad grant, if subsequently abandoned and not consummated — even though in all respects legal and *bona fide* — did not defeat the grant, but upon the failure of such claim the land covered thereby inured to the grant as of the date when it became effective. *Fifth.*

Under such rules of construction the land in controversy was all properly certified to the State for the benefit of the railroad company. *Sixth.* The lands were sold and conveyed by the railroad company to parties who paid full value and bought in good faith, believing the title which the railroad company assumed to convey to be perfect.

It is in the light of these facts that the scope and effect of the legislation of Congress is to be considered and determined. There is certainly much of equity in the contention of the appellees. The railroad company has constructed the road, in aid of whose construction Congress made this grant. Even though retaining all these tracts, it has failed to receive as large an amount of land as Congress proposed to give. With full performance on its side, it has not received all that Congress proffered. Of course, in entering upon its work it took all the chances of failure of title of any particular tract, and therefore has no legal ground of complaint, and yet it may with reason say that, though it must be content with such lands as the Government at the time of the filing of the map of definite location could rightfully convey, it ought not to be deprived of any which the Government did convey, and could convey without wrong to any one, and which were embraced in the description of the lands which Congress proposed to give. No individual is wronged by permitting this certification to stand; no preëmptor or person seeking to enter any tract as a homestead has been deprived of his rights or privileges by virtue of this certification. The land was free from all individual claims. It was within the absolute control of Congress. It belonged to the Government, and it is only in the assertion of a technical rule of construing land grants, first declared by this court long after the certification, that the Government now asks to have that set aside and the title to these lands restored. No fraud or wrong is imputable to the company. No effort to secure a misconstruction by the land department, but only an acceptance of the then settled rule of construction and the taking of the lands which, under such construction, it was entitled to receive. Conceding that that construction was erroneous, yet it was one made by the officers of the department

charged with the duty of administering the grant and determining what lands did and what did not pass, the only tribunal to which the company could then apply, and upon whose rulings it was bound to act. Many years have passed since the certification, and since the company in reliance upon the title it believed it had acquired has disposed of the lands, and other parties have become interested in and have dealt with the lands as private property. Contracts have been entered into, suits maintained — carried even to this court — and decrees and judgments entered and rendered in full reliance upon the title supposed to have been conveyed. Surely after such a lapse of time, and after so many transactions in and in respect to these lands, the appellees are justified in saying that they have large claims upon the equitable consideration of the courts.

The first section of the act of 1887 directs the Secretary of the Interior to adjust all railroad land grants in accordance with the decisions of this court; and the second, that upon such adjustment the Attorney General shall commence the proper proceedings to cancel all patents, certification or other evidences of title erroneously issued. If these two sections were all the legislation of Congress bearing upon the subject it might be difficult to sustain the conclusions of the lower courts, or to deny to the Government the relief sought by this bill, for, by the construction placed upon such railroad grants in *Kansas Pacific Railway Company* v. *Dunmeyer, supra,* and other cases, these lands did not pass under the railroad grant because at the time of the filing of the map of definite location they were on the records of the department claimed under homestead and preëmption entries. The lapse of time would be no bar, for statutes of limitation cannot be invoked against the Government.

But these sections are not all the legislation. Congress evidently recognized the fact that notwithstanding any error in certification or patent there might be rights which equitably deserved protection, and that it would not be fitting for the Government to insist upon the letter of the law in disregard of such equitable rights. In the first place, it has distinctly recognized the fact that when there are no adverse

individual rights, and only the claims of the Government and of the present holder of the title to be considered, it is fitting that a time should come when no mere errors or irregularities on the part of the officers of the land department should be open for consideration. In other words, it has recognized that, as against itself in respect to these land transactions, it is right that there should be a statute of limitations; that when its proper officers, acting in the ordinary course of their duties, have conveyed away lands which belonged to the Government, such conveyances should, after the lapse of a prescribed time, be conclusive against the Government, and this notwithstanding any errors, irregularities or improper action of its officers therein.

Thus, in the act of 1891, it provided that suits to vacate and annul patents theretofore issued should only be brought within five years, and that as to patents thereafter to be issued such suits should only be brought within six years after the date of issue. Under the benign influence of this statute it would matter not what the mistake or error of the land department was, what the frauds and misrepresentations of the patentee were, the patent would become conclusive as a transfer of the title, providing only that the land was public land of the United States and open to sale and conveyance through the land department. The act of 1896 extended the time for the bringing of suits for patents theretofore issued for five years from the passage of that act. It is true that these appellees cannot avail themselves of these limitations because this suit was commenced before the expiration of the time prescribed, and we only refer to them as showing the purpose of Congress to uphold titles arising under certification or patent by providing that after a certain time the Government, the grantor therein, should not be heard to question them.

But limitation was not the only protection given. The act of 1896, which extended the period of limitation, followed such extention with this provision : "But no patent to any lands held by a *bona fide* purchaser shall be vacated or annulled, but the right and title of such purchaser is hereby confirmed." It is true this act was passed after the commencement of this

suit — indeed, after the decision by the Court of Appeals — but it is none the less an act to be considered.   There can be no question of the power of Congress to terminate, by appropriate legislation, any suit brought to assert simply the rights of the Government.   This suit was instituted by the Attorney General in obedience to the direct command of Congress, as expressed in the act of 1887, and Congress could at any time prior to the final decree in this court direct the withdrawal of such suit; and it accomplishes practically the same result when, by legislation within the unquestioned scope of its powers, it confirms in the defendants the title to the property which it was the purpose of the suit to recover.   So, if this act of 1896, taken by itself alone, or in conjunction with preceding legislation, operates to confirm the title apparently conveyed by the certification to the State for the benefit of the railroad company, that necessarily terminates this suit adversely to the Government, and compels an affirmance of the decisions of the lower courts without the necessity of any inquiry into the reasons advanced by those courts for their conclusions.   We are of the opinion that Congress intended by the sentence we have quoted from the act of 1896 to confirm the title which in this case passed by certification to the State.   It not only declares that no patents to any lands held by a *bona fide* purchaser shall be vacated or annulled, but it confirms the right and title of such purchasers.   Given a *bona fide* purchaser, his right and title is confirmed, and no suit can be maintained at the instance of the Government to disturb it.

It is earnestly contended by the Government that the present holders of the title are not "*bona fide* purchasers"; that that term has a fixed and well-defined meaning, as announced in the frequent decisions of this and other courts; that, as said in 2 Pom. Eq. Jur. § 745, "the essential elements which constitute a *bona fide* purchaser are, therefore, three — a valuable consideration, the absence of notice, and presence of good faith"; *United States* v. *California &c. Land Company,* 148 U. S. 31, 42; that while two of these essential elements may be found, to wit, a valuable consideration and the presence of good faith, the third, the absence of notice, is lacking; that all men are

conclusively presumed to know the law, and that as the true rule of construction in reference to these grants was laid down by this court, the purchasers were bound to know such true rule; that the records of the land office disclosed the existence of these homestead entries and preëmption filings, and, therefore, they who purchased from the railroad company knew, or at least were chargeable with knowledge, of the fact that those lands could not rightfully have been certified to the railroad company but were excepted from the terms of grant, and in fact remained the property of the Government. It is further insisted that, as Congress in this statute used this well understood expression, it intended only the protection of such parties as came within the scope of this settled meaning. It is said that the only cases to be covered by this provision were those in which the State or the railroad company by presentation to the land office, before the filing of the map of definite location, of a forged relinquishment by the preëmptor, or one having made a homestead entry, or by some other fraudulent representations, secured a certification or patent to the tracts, and thereafter sold and conveyed to one who purchased in ignorance of the fraud.

We are unable to agree with this contention of counsel, for several reasons: In the first place, the situation as it was known to exist makes against any such narrow construction. While instances of such fraudulent conduct on the part of the State to which the lands were certified, or the company to which the lands were patented, might exist, yet in the nature of things they would be few and hardly worth the special notice of Congress, while on the other hand the fact that there had been a difference between the land department and the courts, one construction obtaining in the former prior to the decisions by the latter, and the further fact that by this difference of construction many tracts had been erroneously certified or patented, must have been well known to Congress, and naturally therefore a subject for its legislation. Further, there was no need of any legislation to protect a "*bona fide*" purchaser." This had been settled by repeated decisions of this court. *United States* v. *Burlington & Missouri River Rail-*

*road Company*, 98 U. S. 334, 342; *Colorado Coal Company* v. *United States*, 123 U. S. 307, 313 — reaffirmed in *United States* v. *California &c. Land Company*, 148 U. S. 31, 41. For in each of those cases it was decided that, although a patent was fraudulently and wrongfully obtained from the Government, if the land conveyed was within the jurisdiction of the land department, the title of a *bona fide* purchaser from the patentee could not be disturbed by the Government, so that this provision was absolutely unnecessary if that which is now claimed by counsel for the Government is all that was intended by Congress. We do not mean to assert that because legislation to cover such a contingency was unnecessary, therefore the language used by Congress necessarily implies something other and different, because of course it may have been that Congress intended nothing but a simple declaration of the law as it was known to exist. At the same time the fact, that under one construction it was needless, raises a presumption that something more was intended, and that Congress had in view the protection of other parties than were already protected by general law.

But we need not rest on these inferences and presumptions. Other provisions of the acts of 1887 and 1896 make clear the intent of Congress. Section 3 of the act of 1887 provides that if the homestead or preëmption entry of any *bona fide* settler has been erroneously cancelled on account of any railroad grant it may be reinstated, provided he has not located another claim or made an entry in lieu of the one so cancelled, and also did not voluntarily abandon such entry. By this section Congress provided for a reinstating of the title of one deprived thereof by an erroneous ruling of the land department, but, at the same time, limited the right of reinstating to cases in which the original entryman had not voluntarily abandoned his entry, or had not since that time made a new entry. In other words, it was limiting the restoration of the title of the original entryman to cases in which he had a continuing and present equitable right to recognition. As to all other cases, Congress reserved the determination of the equities between the Government, the railroad company and pur-

chasers from the latter, and in subsequent sections it made provision for the adjustment of such equities.

Section 4 of the same act, expressly referring to all other lands erroneously certified or patented to any railroad company, provides that citizens who had purchased such lands in good faith should be entitled to the lands so purchased and to patents therefor issuing directly from the United States, and that the only remedy of the Government should be an action against the railroad company for the Government price of similar lands. It will be observed that this protection is not granted to simply *bona fide* purchasers (using that term in the technical sense), but to those who have one of the elements declared to be essential to a *bona fide* purchaser, to wit, good faith. It matters not what constructive notice may be chargeable to such a purchaser if, in actual ignorance of any defect in the railroad company's title and in reliance upon the action of the Government in the apparent transfer of title by certification or patent, he has made an honest purchase of the lands. The plain intent of this section is to secure him the lands, and to reinforce his defective title by a direct patent from the United States, and to leave to the Government a simple claim for money against the railroad company. It will be observed that the technical term "*bona fide* purchaser" is not found in this section, and while it is provided that a mortgage or pledge shall not be considered a sale so as to entitle the mortgagee or pledgee to the benefit of the act, it does secure to every one who in good faith has made an absolute purchase from a railroad company protection to his title irrespective of any errors or mistakes in the certification or patent.

Section 5 of the same act applies to cases in which no certification or patent has issued, and yet the lands sold by the railroad company are the numbered sections prescribed in its grant and coterminous with the constructed portions of its road, and it is there provided that where the lands so sold by the company "are for any reason excepted from the operation of the grant to said company," the purchaser may obtain title directly from the Government by paying to it the ordinary

Government price of such lands. It is true the term used here is "*bona fide* purchaser," but it is a *bona fide* purchaser from the company, and the description given of the lands, as not conveyed and "for any reason excepted from the operation of the grant," indicates that the fact of notice of defect of title was not to be considered fatal to the right. Congress attempted to protect an honest transaction between a purchaser and a railroad company, even in the absence of a certification or patent. These being the provisions of the act of 1887, the act of 1896, confirming the right and title of a *bona fide* purchaser, and providing that the patent to his lands should not be vacated or annulled, must be held to include one who, if not in the fullest sense a "*bona fide* purchaser," has nevertheless purchased in good faith from the railroad company.

We have been referred in the arguments of this and other cases to the debates in Congress, and to the reports of the committees of the two houses to whom the bills were referred as confirmatory of the conclusions we have reached, but it is unnecessary to consider any of the evidence derived from these sources, if, indeed, it is open to consideration, for the language of the two acts is clear, and fully discloses the intent of Congress. Our conclusion is that these acts operate to confirm the title to every purchaser from a railroad company of lands certified or patented to or for its benefit, notwithstanding any mere errors or irregularities in the proceedings of the land department, and notwithstanding the fact that the lands so certified or patented were, by the true construction of the land grants, although within the limits of the grants, excepted from their operation, providing that he purchased in good faith, paid value for the lands, and providing, also, that the lands were public lands in the statutory sense of the term, and free from individual or other claims.

If it be suggested that under the scope of these acts, though the suit must fail so far as it is one to set aside and cancel the certification, it may yet be maintained against the defendant railroad company for the value of the lands so erroneously certified, and that the decree should be modified to this extent,

it is sufficient to say that, first, the Government has not asked any such decree; second, that it may be doubtful whether for the mere purpose of recovering money an action at law must not be the remedy pursued; but lastly, and chiefly, that it does not appear from this record either that the railroad company received an excess of lands or has even received (these lands included) the full quantity of lands promised in the grant; and further, that it does not appear that there were not within the granted or indemnity limits lands which the company might have rightfully received but for this erroneous certification. It will hardly be contended that, if, simply through a mistake of the land department, these lands were certified when at the time other lands were open to certification which could rightfully have been certified and which have since been disposed of by the Government to other parties, so that there is now no way of filling the grant, the Government can nevertheless recover the value of the lands so erroneously certified. In other words, the mistake of the officers of the Government cannot be both potent to prevent the railroad company obtaining its full quota of lands, and at the same time potent to enable the Government to recover from the company the value of lands erroneously certified. Our conclusion, therefore, is that upon the record as it is presented, the decree of the Court of Appeals was right, and it is

*Affirmed.*