## UNITED STATES *v.* CHICAGO, MILWAUKEE AND ST. PAUL RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 54. Submitted November 4, 1904.—Decided December 12, 1904.

Where it does not appear that one claiming to have entered land prior to its withdrawal under a land grant act had done all that was possible to perfect his entry, and had either taken possession or otherwise not acquiesced in the decision, the attempted entry is not sufficient to take the land from jurisdiction of the Secretary of the Interior so as to prevent him from certifying it under the grant as unappropriated lands of the United States.

Under the acts of 1887, 24 Stat. 556, and 1896, 29 Stat. 42, the title of one who holds under the railway company as a *bona fide* purchaser and is in actual ignorance of any defect in the company's title, will not be affected by any constructive notice of such defect with which a purchaser might be chargeable.

Where an entry had been abandoned prior to certification of indemnity lands by the Secretary of the Interior to a State for the benefit of a railroad company under a land grant, the land is unappropriated land of the United States and can be certified under the grant, and the certification will not be set aside in favor of one who attempts to enter the land as a homesteader after the lands have been selected by the railroad company to make up a deficiency in place lands.

THE United States on the sixth day of March, 1893, filed this bill in the Circuit Court of the United States for the District of Minnesota for the purpose of setting aside the certification, under the land grant of Congress, 14 Stat. 87, made by the Secretary of the Interior, of the land described in the bill, to the State of Minnesota, for the benefit of the railroad company, and also to set aside the conveyance thereof by the State to the railroad company, and by the company to one of the individual defendants. A supplemental bill was filed, by leave, March 4, 1901, bringing in by service of the subpœna other individual defendants.

The suit was brought under and pursuant to the act of Congress of March 3, 1887, 24 Stat. 556, entitled "An act to provide for the adjustment of land grants made by Congress

to aid in the construction of railroads and for the forfeiture of unearned lands, and for other purposes."

Upon trial in the Circuit Court the bill was dismissed, and the decree of dismissal was affirmed by the United States Circuit Court of Appeals for the Eighth Circuit, 116 Fed. Rep. 969, and from that decree of affirmance the Government has appealed here.

The facts upon which the controversy arose are, in substance, as follows: On the fourth day of July, 1866, Congress passed an act making an additional grant of lands to the State of Minnesota, 14 Stat. 87, to aid in the construction of railroads in that State. The Southern Minnesota Railroad Company was at the time of the passage of the act of Congress a corporation organized under the laws of Minnesota, with the power to construct a line of railroad as mentioned in that act. The legislature of Minnesota, on the twenty-fifth day of February, 1867, transferred the land granted to it by the act of Congress to the railroad company, subject to the provisions of that act and also of the state statute.

Among the lands thus transferred was a lot eighty acres in extent, in Faribault County, Minnesota, being the property in dispute in this suit. The land was within the indemnity limits of the grant by Congress to the State, as determined by the map of definite location of the railroad, which became effective February 25, 1867. The deficiency in what are termed the "place" lands was largely in excess of eighty acres. On the twenty-ninth day of November, 1870, the Southern Minnesota Railroad Company selected this tract in section 35 in lieu of part of the land lost in the granted limits, and the land was certified to the State of Minnesota by the Secretary of the Interior, March 25, 1871, for the benefit of the railroad company, and on the eighth day of August, 1871, the State of Minnesota conveyed it by deed to the railroad company. In March, 1868, the company had mortgaged all of its property, including the land granted under the act of Congress and all subsequently acquired property, to secure

the payment of its bonds.   This mortgage was foreclosed and
the property sold and conveyed to a new corporation by the
name of the Southern Minnesota Railway Company, and the
land was conveyed to that company.   On the fifth day of
January, 1885, the railway company, by contract in writing,
agreed to sell the land in dispute to one A. Boyeson for the
sum named in that contract.   Boyeson assigned his interest
in the contract, on the sixth of January, to Fredericksen, who,
on the first day of April, 1885, assigned it to the defendant,
Thomas S. Thompson, and, in turn, on the third day of Febru-
ary, 1888, the latter assigned it to Ericksrud, who paid the
balance due upon the contract and received the warranty deed
for the land from the railway company on the twentieth day
of March, 1888.

Ericksrud died intestate on March 27, 1888, and on Novem-
ber 6, 1888, the land was decreed by the probate court to be
the property of the widow and heirs at law of Ericksrud, and
they remained in possession, and on May 24, 1899, these heirs
at law still being in possession, conveyed the same to the de-
fendant Woodwick for the sum of two thousand dollars cash.
This is the title of record coming from the United States to the
State, thence to the railroad company and, by mesne con-
veyances, to the defendant Woodwick, and there was nothing
of record showing that any other person was entitled to the
land at the time when Woodwick paid the two thousand dol-
lars to the heirs of Ericksrud and took the deed therefor.
The defendant Donovan, however, lays claim to the land in
question pursuant to the facts now to be stated.

Prior to the passage of the granting act of Congress, above
referred to, one Luman Barclay had, on the twenty-first day
of June, 1866, entered this land in controversy, and also the
eighty acres in section 26, adjoining, as a homestead.   In the
following year (1867) Barclay abandoned the land and went
to Canada.   Some time after his departure, and in the same
year (1867), Donovan, the defendant, sought to acquire a
homestead on Government land.   He examined the land for

which Barclay had made his entry, and decided to enter it as a homestead. He went to the United States local land office for the purpose and was informed by the register of the land office that he could not make the entry until Barclay's entry was canceled. He was also informed that if he wished to make a claim that Barclay had abandoned his interest, he should publish notice of the time and place where he would make proof upon that matter. He published a notice accordingly, for three weeks, and paid nine dollars as the cost thereof, and in the fore part of August, 1867, made proof that Barclay had abandoned his homestead claim. Donovan insists that he was given to understand that he could enter the land as a homestead, as soon as the local land office received notice from the General Land Office at Washington that Barclay's entry was canceled. He thereupon made one application to enter both tracts of land—the eighty acres in section 26 and the eighty-acre tract in question in section 35, but left the date of application blank, because he could make no entry for the lot in section 35 until Barclay's entry had been canceled. He did this, as he or his witness Bullis said, to head off any other applicant for the land, and he left the application with the local land office. He then went into possession of section 26 and commenced the erection of a house thereon, and he says he commenced the cultivation of a small part of the tract in section 35. This was in the fall of 1867. The Barclay entry was duly canceled at Washington on the fourteenth of January, 1868, and notice thereafter given to the local land office, and Donovan was notified of the fact. On the sixth day of June, 1868, Donovan went to the local land office and applied to enter the two tracts of land. He was there informed that the odd-numbered sections within twenty miles of the road had been withdrawn from market, and that such withdrawal included the section in question, and that he could not, therefore, enter the eighty acres in section 35 as a part of his homestead.

Donovan acquiesced in this determination of the local land

office, and made his entry for the eighty acres in section 26. The old application for the two lots was destroyed and a new one made out for the lot in section 26. He thereafter used the land in section 35 in connection with his own in section 26, and cut grass upon and plowed some of it, but it does not appear that he laid any claim to it as land which he had attempted to enter and which had been improperly or wrongfully refused him. His house and other permanent improvements were on section 26. At the time he made proof (in 1875) for the eighty acres in section 26, Donovan says he offered to make proof also as to the land in section 35, but his offer was rejected because, among other reasons, he had not entered the land in that section. He has obtained his patent for the eighty acres in section 26.

On the twenty-sixth day of June, 1883, Donovan applied at the local land office to enter this tract of land in section 35 as an additional homestead, under the act of March 3, 1879, 20 Stat. 472, and the register certified that the application was for surveyed lands of the class the applicant was legally entitled to enter under the homestead act of 1862; in other words, unappropriated public lands of the United States. The application was rejected upon the ground that the land so applied for had been certified to the State of Minnesota for the benefit of the railroad company. Donovan appealed from this rejection to the Commissioner of the General Land Office, where, it is stated, the matter is still pending and undetermined.

In 1885 the defendant Thompson, an assignee of the contract made by the railway company with Boyesen, went into possession of the eighty acres in section 35, and ordered Donovan off the same, and Donovan left the land accordingly. After Thompson took possession of the land, April 1, 1885, Donovan, in the same year, commenced a suit in the District Court of Faribault County to obtain possession of the land, and on or about the twenty-fourth of March, 1887, the state court decided that Donovan had no title to the land or

right to the possession of the same, and that Thompson had the right to the possession thereof under the contract already mentioned. This judgment against him in the state court was never appealed from by Donovan, nor has it ever been vacated, modified or reversed. In 1888 Donovan applied to the Land Department at Washington for relief by reason of the act of Congress of March 3, 1887, heretofore referred to. In relation to that application the Commissioner of the General Land Office, on February 14, 1889, addressed a letter to the Secretary of the Interior, and therein spoke of Donovan's application for the institution of proceedings under that act of Congress, and said that Donovan had no title to the land, but he sent all the papers to the Secretary for review by him. On the first of April, 1889, the Secretary replied to the communication of the Commissioner of the General Land Office, and therein reversed his holding, and directed the latter to make a demand of the railway company for the reconveyance of the land, as provided for in the act. On the twelfth of April 1890, the Commissioner sent a communication to the Secretary, informing him that a demand for the reconveyance of the land had been made April 9, 1889, upon the railroad company, and that no answer had been made, although more than a year had elapsed since the demand. On the sixteenth of April, 1890, the Secretary of the Interior transmitted the letter to the Attorney General with a request that suit might be instituted to have the certification of the land in question by the Land Department to the State of Minnesota set aside and canceled if, in the opinion of the Attorney General, the suit could be maintained. After waiting three years, and on the sixth of March, 1893, the United States filed its bill against the Chicago, Milwaukee and St. Paul Railway Company as successor in interest of the former companies, and also against the Southern Minnesota Railway Company, Michael Donovan, Thomas S. Thompson and C. C. Ericksrud. On August 11, 1894, the companies answered the bill. Donovan did not answer it until March 6, 1901; and then confessed the same,

and prayed that the relief asked for might be granted. On March 4, 1901, the United States filed a supplemental bill, wherein it was stated that no service had ever been made upon Thompson or Ericksrud, and that on June 24, 1899, the heirs of Ericksrud had joined in a deed conveying the land in question to Louis K. Woodwick. Process was prayed against the defendants, the heirs of Ericksrud, and also against Woodwick, and subpœnas were served on them, and on May 2, 1901, they answered the supplemental bill. A special examiner was appointed to take testimony, and on January 13, 1902, he submitted his report of the testimony taken in the suit, to the court.

*Mr. Assistant Attorney General Purdy* for the United States, appellant:

When the Government is a mere formal complainant in a suit, not for the purpose of asserting any legal right or protecting any public interest, title or property, but merely to form a conduit through which one private person can conduct litigation against another private person, a court of equity will not be restrained from administering the equities existing between the real parties by any exemption of the Government designed for the protection of the United States alone. *United States* v. *Beebe,* 127 U. S. 338.

The court below failed to give the proper effect to the act of March 3, 1887, 24 Stat. 556. As to this statute, see *United States* v. *Winona &c. R. R. Co.,* 67 Fed. Rep. 969; *Ore. & Cal. R. R. Co.* v. *United States,* 189 U. S. 103. If there were any laches they were laches of officers of the United States and not of Donovan. *Kelly* v. *Boettcher,* 85 Fed. Rep. 55, 62.

The lands in the indemnity limits of the grant were not withdrawn from market on September 10, 1866, and the cancelation of Barkley's entry on January 14, 1868, restored the 80-acre tract in controversy to market, and subject to entry by the first legal applicant. Where a tract of land in the place or granted limits is subject to a homestead or pre-

emption claim at the date of the grant, it is thereby forever excepted from the grant. *Bardon* v. *Northern Pacific Railroad Co.*, 145 U. S. 535. Where land along the indemnity limits of a railroad grant is subject to a homestead or preemption claim at the time of the grant, which claim is afterward canceled, the land then becomes subject to selection by the railroad company or any other legal applicant. *Ryan* v. *Railroad Co.*, 99 U. S. 382; *Wisconsin Central R. R. Co.* v. *Price County*, 133 U. S. 496, 511; *Hewitt* v. *Schultz*, 180 U. S. 139.

Where Congress provides for the withdrawal of lands from market, any withdrawal contrary to such provisions is absolutely void. *Northern Pacific* v. *Davis*, 19 Land Decisions, 87; *Atl. & Pac. R. R. Co.*, 6 Land Decisions, 84, 87; *St. P., Minn. & Man. Ry. Co.* v. *Iverson*, 14 Land Decisions, 79.

Where a homestead or preëmption claim has attached to land, such land is thereby segregated from the public domain, and for the time being is withdrawn from the jurisdiction of the Secretary of the Interior and the Land Department, and so continues until the entry is canceled. *So. Pac. Railway Co.* v. *Bell*, 183 U. S. 675; *Ore. & Cal. R. R. Co.* v. *United States*, 189 U. S. 103.

Donovan's application to the local land office to enter the land was, under the facts in the case, equivalent to a legal entry.

Where a party applies to enter, under the homestead or preëmption laws of the United States, a tract of land which is subject to be so taken, and he is qualified to thus acquire the same, and his application is erroneously rejected by the Government officials, his right thereto attaches just the same as though his application had been allowed; and if he continues in possession and complies with the law so as to be entitled to a patent, he acquires a vested interest of which he cannot be deprived even by an act of Congress. *Shepley* v. *Cowan*, 91 U. S. 330; *Ard* v. *Brandon*, 156 U. S. 537, and cases cited; *Weeks* v. *Bridgman*, 159 U. S. 541; *Turpey* v.

*Madsen,* 178 U. S. 215; *Goodale* v. *Olney,* 12 Land Dec. 324; *Coder* v. *Lotridge,* 12 Land Dec. 643.

As Donovan had complied with all the requirements of the law, including payment for the land, to entitle him to a certificate and patent for the same, he thereby acquired a vested interest in the land of which he could not be deprived by any act of Congress. *Gonzales* v. *French,* 164 U. S. 338, 346.

Where a party has paid for the land and has complied with the law for the acquisition of the same he thereby becomes the absolute owner, and may deal with the same as his own, and the same is subject to taxation, although he may not have received his patent therefor. In such case the Government merely holds the legal title in trust for him. *Carroll* v. *Safford,* 3 How. 441; *Astrom* v. *Hammond,* 3 McLean, 198; *Carroll* v. *Perry,* 4 McLean, 26; *Ross* v. *Supervisors &c.,* 12 Wisconsin, 38; *People* v. *Shearer,* 30 California, 645; *Newkirk* v. *Marshall,* 10 Pac. Rep. (Kan.) 571; *Hawley* v. *Diller,* 178 U. S. 476.

Donovan's entry and occupation of the lands in controversy and cultivation of the same up to 1871, with the purpose of entering the same as his homestead, had the legal effect of so withdrawing such lands that the officers of the Land Department had no authority to issue a certification to the State of Minnesota, and their acts in so doing with respect to this tract of land were void. *Doolan* v. *Carr,* 125 U. S. 618, 624, and cases cited.

A patent is but evidence of a grant, and the officer who issues the same acts ministerially and not judicially. *United States* v. *Stone,* 69 U. S. 525; *Hawley* v. *Diller,* 178 U. S. 476; *Newkirk* v. *Marshall,* 10 Pac. Rep. 571; *Burr* v. *Greeley,* 52 Fed. Rep. 926; *Weeks* v. *Bridgman,* 159 U. S. 541; *Gertgens* v. *O'Connor,* 191 U. S. 237.

As to who is a *bona fide* purchaser under the acts of 1887 and 1896, see *United States* v. *Winona &c. R. R. Co.,* 165 U. S. 463, 478; *Colo. Coal & I. Co.* v. *United States,* 123 U. S. 307, 313; *Murray* v. *Ballou,* 1 Johns. 565, and cases *supra.*

*Mr. Burton Hanson* and *Mr. W. H. Norris* for railway com-company, appellee:

*Mr. Andrew C. Dunn* for Woodwick and others, appellees:
The railway company has no proper relation to this suit; and no relation to the relief sought; it has no relation to the suit, except as having been mistakenly made defendant, and as having been as mistakenly joined in answer, as if properly impleaded.

The bill relates solely to one parcel of indemnity land and the cases cited as to the withdrawal of the Secretary being unauthorized are inapplicable. See *Military Reservation*, 6 Land. Dec. 18; *Woolsey* v. *Chapman*, 101 U. S. 768; *Wood* v. *Beach*, 156 U. S. 548; *Dunmeyer Case*, 113 U. S. 629; *Winona & St. Peters' Case*, 165 U. S. 463, 473.

Donovan's attempted entry was illegal. *Bullard* v. *Des Moines &c.*, 122 U. S. 167; *St. P. & P.* v. *Nor. Pac.*, 139 U. S. 1, 18; *United States* v. *Holmes*, 105 Fed. Rep. 41.

Even where the entryman goes on the public land in good faith this fact would not justify ignoring the clear rights of the railroad company under the land grant act. *Nor. Pac.* v. *Amacker*, 175 U. S. 564; *The Whitney Case*, 132 U. S. 364; *Norton* v. *Evans*, 82 Fed. Rep. 804; *Wagstaff* v. *Collins*, 97 Fed. Rep. 3.

The cancelation of the Barkley entry immediately made this tract selectable by the railroad company. *Ryan* v. *Railway Co.*, 99 U. S. 382, 388; *United States* v. *Burlington &c. R. R. Co.*, 98 U. S. 341; *Hahn* v. *United States*, 107 U. S. 402; *Brown* v. *United States*, 113 U. S. 568; *United States* v. *Philbrick*, 120 U. S. 62; *Burr* v. *Greeley*, 52 Fed. Rep. 926; *United States* v. *Railroad Co.*, 67 Fed. Rep. 948, 954.

As to Woodwick's good faith, see *Union Trust Co.* v. *So. Nav. Co.*, 130 U. S. 565; *Jorgenson* v. *M. & St. L. Ry. Co.*, 25 Minnesota, 206; *United States* v. *So. Pac. R. Co.*, 184 U. S. 49.

Where the United States is a mere formal complainant as a conduit for litigation for a private person it cannot extend

its immunity as a sovereign government to protect such individual. *Curtner* v. *United States,* 149 U. S. 662, 674; *United States* v. *Beebe,* 127 U. S. 338, 347; *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, 284; *United States* v. *Des Moines &c. Co.,* 142 U. S. 510, 538; *United States* v. *Bell Telephone Co.,* 167 U. S. 240, 265; *Moran* v. *Horsky,* 178 U. S. 205.

The court will administer the equities between Donovan and Woodwick and not permit the United States to protect Donovan and it will look back of the nominal and find the real parties. *New York* v. *Louisiana,* 108 U. S. 76.

Donovan, apart from the United States, has been guilty of laches himself. *St. P. &c. Ry. Co.* v. *Sage,* 44 Fed. Rep. 315. See Minnesota Statutes, §§ 5134, 5136, 5817, of 1894; ch. 68, March 9, 1874; § 1, ch. 75, Gen. Stat., 1866.

A party by mere settlement upon public lands with intention to obtain title to same under the preëmption laws, does not thereby acquire such vested interest in the premises as to deprive Congress of the power to dispose of the property, and notwithstanding the settlement Congress can reserve the lands from sale. *Frisbie* v. *Whitney,* 9 Wall. 187; *Yosemite Valley Case,* 15 Wall. 77, 82.

MR. JUSTICE PECKHAM, after making the foregoing statement of facts, delivered the opinion of the court.

The Attorney General contends that before the passage of the act of Congress granting the land (July 4, 1866) Barclay had made legal entry upon the books of the local land office of the land in question, under the homestead laws of Congress, and that such legal entry was in existence at the time of the passage of the act of Congress of July 4, 1866; that by reason of such entry the land was excepted from the grant under that act, and that when Barclay abandoned his homestead claim upon the land it immediately became public land of the United States, and did not then pass under the grant to the State pursuant to the act of July 4, 1866, and it was

therefore not legally withdrawn from market by any act of the Land Department, nor could it be certified to the State, and that the attempt to do so was not only erroneous, but absolutely void; that at the time when Donovan made application to enter the land, in June, 1868, it was part of the public lands of the United States, open to entry, and his application, although he had done all that he could, was wrongfully denied by the local land office; that thereafter the filing of the map of definite location by the railway company, and its selection of the land in question, and the certification of the land by the Secretary of the Interior to the State, and the conveyance by the State to the railway company, and the contract and conveyances following thereon, conveyed no interest in or title to the premises in question, but that they rightfully belonged to Donovan, and therefore the certification by the Land Department, etc., should be set aside, to the end that the land may be transferred to Donovan as demanded in the bill.

On the other hand, it is insisted on the part of the defendant Woodwick that the action of the Land Department officials in withdrawing the land in question from market was valid and within the jurisdiction of that department; that the selection of the land by the railway company was proper, as being within the indemnity limits of the grant by Congress, and that its certification by the Secretary of the Interior to the State was within the power of that officer, and the act was not, therefore, beyond his jurisdiction, and that his certification and the action of the State conveyed a good title, or, at any rate, that the defendant Woodwick was a *bona fide* purchaser of the land, and as such his rights were preserved under the act of March 3, 1887. 24 Stat. 556.

If Woodwick is protected under that act, as a purchaser in good faith, even against Donovan, it is unnecessary to pursue an inquiry as to the existence of any other defense. We are of opinion that Woodwick is protected under the fourth section of the act. The plain intent of that section

is, as stated by Mr. Justice Brewer in delivering the opinion of the court in *United States* v. *Winona &c. Railroad,* 165 U. S. 463, to secure one who in good faith and as an honest transaction purchases the land, and to leave to the Government a simple claim for money, against the railroad. The justice said (pp. 480, 481):

"It will be observed that the technical term '*bona fide* purchaser' is not found in this section, and while it is provided that a mortgage or pledge shall not be considered a sale so as to entitle the mortgagee or pledgee to the benefit of the act, it does secure to every one who in good faith has made an absolute purchase from a railroad company protection to his title irrespective of any errors or mistakes in the certification or patent.

"　.  .  . These being the provisions of the act of 1887, the act of 1896, 29 Stat. 42, confirming the right and title of a *bona fide* purchaser, and providing that the patent to his lands should not be vacated or annulled, must be held to include one who, if not in the fullest sense a '*bona fide* purchaser,' has nevertheless purchased in good faith from the railroad company."

The counsel for the Government, while strenuously denying that the legal title to this land passed to the State of Minnesota, by virtue of the certification, in 1871, admits in his brief that if Woodwick bought the land as a *bona fide* purchaser in 1899, and acquired the legal title to the same, then at that present time not only was the right of the United States to recover the land defeated, but Donovan was precluded from thereafter asserting his claim to the land as against such *bona fide* purchaser. His denial that the legal title passed is based upon the contention that Donovan, before the year 1871, when the Secretary of the Interior certified this land to the State had, as stated by counsel, initiated proceedings to obtain this land in section 35 as a homestead, and had done all he could to make entry thereof, and had been in possession for three years before this certification, and that　,

prior to 1871 an initiatory title had passed from the United States to Donovan by reason of his possession and offer to enter the land, and his payment of the fees and expenses to the local land officers; so as to prevent the passage of the legal title to the State, by virtue of the certification referred to, which, by reason of the acts of Donovan, was rendered wholly void. It is also asserted that if the United States, in 1871, did retain title in itself, notwithstanding Donovan's occupation and cultivation of the land, yet such occupation and cultivation withdrew the land from the jurisdiction of the Land Department, so far as any right or power to issue a certification to the railroad company was concerned, just as effectually as though the land had been reserved or otherwise appropriated specifically by an act of Congress.

We think that in 1871, when the certification was made, jurisdiction over this land remained in the Land Department, to be exercised by the Secretary of the Interior, notwithstanding the acts of Donovan as shown by this record. It is shown by the testimony of Donovan himself and of his witness Bullis, putting it all together, that there never was, in fact, any entry of this land at the local land office, in the name of Donovan, before the certification in 1871. The facts as to what took place at that office in regard to the applications of Donovan in 1867 before the Barclay entry was canceled, and in June, 1868, when the entry was made for the lot in section 26, are set forth in the statement of facts herein, and need not be repeated. The statement shows no such facts as put Donovan in the place of one who, having done all he could to enter the land, had been refused such entry, but had nevertheless not acquiesced in such decision and had taken possession of it as a homestead. On the contrary, Donovan did acquiesce in that decision and amended his application.

There was no entry made on the books of the local land office for this land under the amended application, and the power of the Secretary of the Interior to make the certification, even if we assume that it was erroneously exercised,

was not an act which was beyond the jurisdiction of the Secretary. The legal title was thus transferred by the Government to the State, and at the most it was an erroneous certification within the meaning of the act of 1887. Although under such circumstances, if the certification were erroneous and might have been avoided and the land recovered back by the Government while in the hands of the railroad company, yet Woodwick, if a purchaser in good faith of the lands, was entitled to them under the provisions of the act. He had no notice, actual or constructive, of the claim of the Government in regard to this land. The record title was plain. No suit had been commenced when Ericksrud took his title from the Government and went into possession thereunder. He died within a week thereafter, and his heirs thereupon took possession. They were in possession when the Government commenced this suit, in 1893, but were never served with process therein until 1901, which was two years after Woodwick had purchased the property from them and had in good faith paid them the sum of $2,000 in cash for the land.

Counsel for the Government admits that it is futile to maintain that Woodwick had constructive notice of the defects in his title by reason of the pendency of this suit, which had been commenced by the Government in 1893, but in which the railroad companies alone had been served with process.

Whatever equities Donovan may have had as against the Government by virtue of his so-called attempt to make entry for the eighty acres in section 35, they do not override the plain provisions of the statute of 1887, and also that of 1896, 29 Stat. 42, which save the rights of one who purchased from the railroad in good faith.

As was observed by Mr. Justice Brewer, in the case already referred to, *United States* v. *Winona &c. Railroad*, 165 U. S. at 480, "It matters not what constructive notice may be chargeable to such a purchaser if, in actual ignorance of any defect in the railroad company's title and in reliance upon

the action of the Government in the apparent transfer of title by certification or patent, he has made an honest purchase of the lands."

Donovan is not brought within the case of *Winona &c. Railroad* v. *United States*, immediately following the above cited case, at page 483, because, among other facts, it appears. herein that there was no record of any entry in Donovan's case for this land on the books of the local land office, and it is conceded that he had been out of any possession of the land since 1885. The above cited case is not, therefore, in point. The same may be said of *Duluth &c. Railroad* v. *Roy*, 173 U. S. 587, and *Oregon &c. Railroad* v. *United States* (Nos. 1 and 2), 189 U. S. 103, 116.

Donovan cannot be regarded as having by his action secured a vested interest in this land, so as to make the certification to the State a wholly void act, as an act beyond the jurisdiction of the Secretary. Assuming that it may have been erroneous and voidable, it was not void. We do not decide it was erroneous. In 1871 the legal title, still remaining in the Government, was transferred to the State by the certification of the Secretary, and, as we have said, Woodwick occupied the position of a purchaser in good faith under the acts of Congress.

The judgment is

*Affirmed.*