STATE of Alaska, DEPARTMENT OF TRANSPORTATION & PUBLIC FA-CILITIES, Appellant, Cross-Appellee,

v.

The FIRST NATIONAL BANK OF ANCHORAGE, Appellee, Cross-Appellant.

Nos. S–114, S–133.

Supreme Court of Alaska.

Oct. 12, 1984.

Marc D. Bond, Eugene F. Wiles, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for appellant, cross-appellee.

Michael W. Price, Groh, Eggers, & Price, Anchorage, for appellee, cross-appellant.

Before BURKE, C.J., and RABINOWITZ and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal arises out of an inverse condemnation action filed by the First National Bank of Anchorage (Bank) when the State of Alaska increased the width of the Old Glenn Highway on land owned by the Bank. The superior court granted the Bank's motion for summary judgment on the issue of liability, concluding that the State possessed an easement only forty feet wide along the roadbed of the Old Glenn Highway. The case was then referred by the superior court to a master for determination of damages. Final judgment was subsequently entered for the Bank. Thereafter the State brought this appeal and the Bank cross-appealed.

The State claims it has an existing 150 foot from centerline right-of-way pursuant to Public Land Order ("PLO") 601, PLO 757, Departmental Order ("DO") 2665, PLO 1613, and a 1959 Quitclaim Deed from the United States to the State of Alaska. In advancing its claim the State once again repeats the arguments this court previously rejected in *State v. Alaska Land Title Association,* 667 P.2d 714 (Alaska 1983) and *Resource Investments v. State,* 687 P.2d 280, (Alaska, 1984). The case at bar, however, raises novel questions concerning the effect of PLO 95, a secret withdrawal for military purposes, enacted in 1943 and subsequently revoked in 1953, on homestead entries made on land withdrawn by its terms, and on the interplay between it and PLO 601.

## I. FACTS

The relevant portion of the Old Glenn Highway was built in the early 1930s. The land in question was among lands withdrawn "from all forms of appropriation under the public-land laws" by PLO 95 on March 12, 1943. PLO 95 was a secret withdrawal by the War Department for military purposes in the interest of the war effort.[1] On June 10, 1946, Robert W. Pippel (the Bank's predecessor in interest) applied for a homestead entry which embraced the land in question. On June 11, 1946, the Anchorage office of the Bureau of Land Management allowed the entry.[2] Thereafter, in February of 1947, the Bureau of Land Management completed a review of Pippel's homestead entry. Based upon this review, the Director of BLM cancelled Pippel's entry on May 12, 1947.[3]

On January 15, 1948, the Director of the Bureau of Land Management wrote the District Land Office in Anchorage, and instructed the then acting manager to hold in abeyance any further action on Pippel's homestead entry. This was based upon a report received from the War Department stating that the Department, in part, intended to relinquish its interest in the lands on which the Pippel homestead was located. Final proof as to entry was submitted by

---

**1.** PLO 95 was not published in the Federal Register until August 2, 1946, 11 Fed.Reg. 8364, and was not recorded in the Anchorage Land Office until September 13, 1946.

**2.** Actual residence by Pippel on the land did not commence until March 1, 1948, according to his final proof.

**3.** Pippel was not given notice that the Bureau had conducted a review of his entry, nor was he given notice that his entry had been cancelled.

The basis for the cancellation was that the lands Pippel had entered were in their entirety subject to the prior withdrawal of PLO 95, and therefore his entry had been erroneously allowed.

Pippel on October 4, 1948.[4]  On July 14, 1950 BLM completed its field report in regard to Pippel's entry.  The report in part contained a recommendation that the Director's decision of May 27, 1947, cancelling Pippel's entry be withdrawn and the entry allowed.[5]  Thereafter BLM issued a final certificate on July 20, 1950 and a patent was issued to Pippel on October 11, 1950.

The withdrawal of the land in question by PLO 95 was not revoked until April 15, 1953.[6]  On August 10, 1949, the Secretary of the Interior promulgated PLO 601.  In part PLO 601 provided that:

> Subject to valid existing rights and to existing surveys and withdrawals for other than highway purposes, the public lands in Alaska lying within 300 feet on each side of the center line of the Alaska Highway, 150 feet on each side of the center line of all other through roads, ... in accordance with the following classifications, are hereby withdrawn from all forms of appropriation under the public-land laws, ... and reserved for highway purposes:

### THROUGH ROADS

... Glenn Highway ...[7]

Section 21(a) of the Omnibus Act,[8] enacted on June 25, 1959, directed the Secretary of Commerce to transfer all interests in land used by the Bureau of Public Roads in Alaska, with certain exceptions, to the new

State of Alaska.  On June 30, 1959, the Acting Secretary of Commerce executed a quitclaim deed, conveying the Federal Government's interest to the State of Alaska.[9]

### II. *The Effect of Pippel's Homestead Entry.*

The State argues that entry onto land subject to a previous withdrawal is of no effect and creates no rights in the entryman.  From this the State concludes that BLM correctly cancelled Pippel's entry in 1947.  The State further contends that a withdrawal of land remains in effect until the withdrawal is officially relinquished, even if the agency for which the withdrawal was made had previously filed a notice of intention to relinquish the land.  Thus the State reasons that Pippel could not have acquired any valid rights to the land until PLO 95 was revoked by PLO 891 on April 15, 1953.  Alternatively, the State takes the position that Pippel could not have had a valid existing right as against the United States until the cancellation of his entry was "withdrawn" by the granting of a final certificate in 1950, after the effective date of PLO 601.  Thus the State would have this Court hold that Pippel's rights did not accrue until after PLO 601 was issued and that his land is therefore subject to the 150 foot right-of-way specified for the Glenn Highway in PLO 601.

We have concluded that the State's arguments are unpersuasive and that the judg-

---

4.  Final proof was initially submitted by Pippel on April 26, 1948, but was withdrawn on August 30, 1948, because Pippel had apparently failed to comply with residency requirements.

5.  The examiner-author of the 1950 field report stated that in his "opinion ... the War Department is no longer interested in any of the land included in this entry."

6.  This was achieved by virtue of the provisions of PLO 891, 18 Fed.Reg. 2294 (1953).  This order specifically provided that lands released from the PLO 95 withdrawal and not otherwise reserved were not subject to the initiation of any rights or to any disposition under the Public Land laws until such was provided by Orders of Classification to be issued by the Regional Administrator of the Bureau of Land Management in Anchorage.

7.  Thereafter PLO 757 modified PLO 601 as it applied to local and feeder roads.  PLO 757 also confirmed the withdrawal of 150 feet from the center line of the Glenn Highway for highway purposes.  16 Fed.Reg. 10749 (1951).  DO 2665, 16 Fed.Reg. 10752 (1951), established easements for feeder roads and local roads released from the withdrawal of PLO 601.  On April 7, 1958, the road withdrawal for the Glenn Highway pursuant to PLO 601 and PLO 757 was revoked, and an easement substituted therefor by PLO 1613, 23 Fed.Reg. 2376 (1958).

8.  P.L. 86–70, 73 Stat. 141.

9.  This 1959 quitclaim deed transferred whatever rights-of-way the United States had along the Old Glenn Highway to the State of Alaska.

ment of the superior court should be affirmed.

Pippel's 1946 entry constituted a "valid existing right" which expressly exempted the lands encompassed within his entry from the operation of PLO 601 [10] which was issued in 1949. In *Alaska Land Title Association*, 667 P.2d 714, 724, we noted that PLO 601 withdrawals were made expressly subject to "valid existing rights." We further said that:

> Homestead entries have been held to give rise to valid existing rights, although these rights may not in all cases take priority over intervening government acts. Here, however, there is no doubt of the intention to except prior homestead entries from PLO 601. As we have noted, PLO 601 was promulgated pursuant to 43 U.S.C. § 141. 43 U.S.C. § 142 states that "there shall be except-

ed from the force and effect of any withdrawal made under the provisions of ... section 141 ... all lands which are, on the date of such withdrawal, embraced in any lawful homestead ... entry ...." [11]

The State does not question the validity of Pippel's patent.[12] Once the patent is issued, any defects in the preliminary steps required by the homestead laws are cured. *Burke v. Southern Pacific Railroad Co.*, 234 U.S. 669, 692, 34 S.Ct. 907, 916, 58 L.Ed. 1527, 1549 (1914). When Pippel received his patent, his 1946 entry became presumptively valid.[13]

AFFIRMED.[14]

---

10. PLO 601 by its terms was "[s]ubject to valid existing rights and to existing surveys *and withdrawals for other than highway purposes* ...." (emphasis added) Therefore it could not have affected the land withdrawn for military purposes by PLO 95 until that withdrawal was revoked in 1953 by PLO 891. At that time Pippel already had his patent which certainly was a "valid existing right."

11. More recently in *Resource Investments v. State*, 687 P.2d 280, (Alaska, 1984), we discussed PLO 601 and the effect of a prior unperfected homestead entry. In this regard we said in part:

> In *Stockley v. United States*, 260 U.S. 532, 544 [43 S.Ct. 186, 189], 67 L.Ed. 390, 395 (1923), the United States Supreme Court recognized that an unperfected homestead entry was within an excepted category of "existing valid claims" excluded from the terms of a government withdrawal order. The Court stated:
>
> > [T]here is excepted from the operation of the order "existing valid claims." Obviously this means something less than a vested right, such as would follow from a complete final entry, since such a right would require no exception to insure its preservation. The purpose of the exception, evidently, was to save from the operation of the order claims which had been lawfully initiated, and which, upon full compliance with the Land Laws, would ripen into a title.
> >
> > For the same reason, it seems apparent that the Secretary of the Interior intended to except pre-patent homestead entries from the operation of PLO 601.
>
> We conclude that Schandelmeier's entry was a valid existing right, therefore no part of his homestead was affected by PLO 601.

12. Although the issuance of the patent was improper because the land was not subject to homesteading due to its prior withdrawal, once the six-year statute of limitations for challenging a patent specified in 43 U.S.C. § 1166 expired the patent became unassailable. *United States v. Chandler-Dunbar Water Power Co.*, 209 U.S. 447, 450, 28 S.Ct. 579, 580, 52 L.Ed. 881, 887 (1908). In this regard the Supreme Court of the United States has explained, "[i]f the act were confined to valid patents it would be almost or quite without use." *See also United States v. Winona & St. Peter R.R. Co.*, 165 U.S. 463, 475–76, 17 S.Ct. 368, 370–71, 41 L.Ed. 789, 795 (1897). *See also* AS 09.10.230.

13. The State, standing in the shoes of the federal government, would be estopped to deny the validity of Pippel's entry in any event. Pippel was never even informed that his entry was being cancelled or afforded the right to appeal that decision. Subsequently, the BLM treated his entry as though it was valid, issuing him a final certificate and patent based upon it. The government should not be permitted retroactively to invalidate the deliberate actions of its officers after they have been reasonably relied on for 34 years. *See Municipality of Anchorage v. Schneider*, 685 P.2d 94 (Alaska, 1984); *Fields v. Kodiak City Council*, 628 P.2d 927, 931 (Alaska 1981).

14. Our resolution has made it unnecessary to address any of the other issues tendered by the parties in the appeal and cross-appeal.