## TETLIN NATIVE CORPORATION, Appellant,

v.

## STATE of Alaska, Richard Knapp, Commissioner of the Alaska Department of Transportation and Public Facilities and Mat–Su, Inc., Appellees.

No. S–2265.

Supreme Court of Alaska.

July 29, 1988.

---

11. The attorneys who participated in the case billed at an hourly rate of $90.00–125.00.

Frederick H. Boness, Preston, Thorgrimson, Ellis & Holman, Anchorage, for appellant.

E. John Athens, Jr., Asst. Atty. Gen., Fairbanks, Grace Berg Schaible, Atty. Gen., Juneau, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This appeal concerns five material site easements located within land owned by the Tetlin Native Corporation (Tetlin). The land was conveyed to Tetlin pursuant to § 19(b) of the Alaska Native Claims Settlement Act (ANCSA). 43 U.S.C. § 1618(b) (1982). On cross-motions for summary judgment, the trial court ruled in favor of the State of Alaska. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Shortly after statehood the State of Alaska (State) proceeded to obtain interests to material site easements or rights-of-way across land held by the United States government. The material site easements are a source of sand and gravel for highway construction and maintenance. In 1960 the State applied to the Bureau of Land Management (BLM) for two material site easements located within the boundaries of the Tetlin Indian Reserve.[1]

The BLM granted to the State one material site easement, stating its authority to grant the request was "found in regulations from 43 C.F.R. 244.54(a)(1) and Section 17 of the Federal–Aid Highway Act of November 9, 1921, (42 Stat. 216, 23 U.S.C. 18)."[2] Several months later, on October 4, 1961, the BLM issued a decision rejecting the other application on the grounds that the BLM lacked jurisdiction to approve a "right-of-way entirely within an Indian

Reservation."[3] BLM advised the State to file an application with the Bureau of Indian Affairs (BIA) or appeal to the Director of the BLM. The State did not appeal the BLM decision. Instead, in early 1963 it applied to the BIA for the five material site easements in question. One of the five material sites was the same site which had been rejected by the BLM in 1961.

As part of the BIA application process, on August 6, 1963, the Tetlin Native Council[4] consented by resolution "to the jurisdictional transfer of the necessary material pits for the construction and improvement of the Alaska Highway by and through the Bureau of Indian Affairs Realty Office...." The State was assessed $1,473.48 as compensation for these material sites. The BIA approved this compensation as being "just and adequate." In 1964 the BIA formally granted the State's request for the five material sites pursuant to 25 U.S.C. § 323 (1982)[5] and 25 C.F.R.

---

1. In 1930, President Hoover withdrew certain public lands "to promote the interests of the natives by appropriate vocational training, to encourage and assist them in restocking the country and protecting the fur-bearing animals, and to otherwise aid in the care and support of said natives...." Executive Order 5365. This withdrawal subsequently became known as the Tetlin Indian Reserve. The Executive Order expressly excluded all "oil, coal, or other mineral deposits found at any time in the land, and the right to prospect for, mine and remove the same" from the interests withdrawn for the benefit of the Tetlin people. *Id.*

2. The Federal–Aid Highway Act of 1921 was repealed by the Highway Act of August 27, 1958, Pub L. No. 85–767, 72 Stat. 919. However § 17 of the 1921 Act was replaced with a near verbatim provision in the 1958 Act, 23 U.S.C. § 317 (1982). Section 317 provides:

    (a) If the Secretary [of Commerce] determines that any part of the lands or interests in lands owned by the United States is reasonably necessary for the right-of-way of any highway, or as a source of materials for the construction or maintenance of any such highway adjacent to such lands or interests in lands, the Secretary shall file with the Secretary of the Department supervising the administration of such lands or interests in lands a map showing the portion of such lands or interests in lands which it is desired to appropriate.

    (b) If within a period of four months after such filing, the Secretary of such Department shall not have certified to the Secretary that

the proposed appropriation of such land or material is contrary to the public interest or inconsistent with the purposes for which such land or materials have been reserved ... then such land and materials may be appropriated and transferred to the State highway department, or its nominee, for such purposes and subject to the conditions so specified.

3. The BLM cited 43 C.F.R. 244.55 (1955) as grounds for denying the material site easement. 43 C.F.R. 244.55 (1955) provides in part:

    No application will be received by the [BLM] for rights-of-way affecting lands entirely within a national forest or an Indian reservation.
    Part 244 of Title 43 was redesignated as part 2234 in 1964. 43 C.F.R. Redesignation Table (1964 Supp.). Part 2234 was later redesignated as part 2800. 43 C.F.R. Redesignation Table (1976).

4. Tetlin Native Council is the Native government of the Tetlin Indian Reserve organized pursuant to the Indian Reorganization Act, 25 U.S.C. §§ 473a, 476, 477 (1982).

5. 25 U.S.C. § 323 (1982) provides:
    The Secretary of the Interior be, and he is empowered to grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes, communities, bands, or nations, or any lands now or hereafter owned, subject to restrictions against alienation, by individual Indians or

part 161 (1958).[6]

In 1971, Congress passed the Alaska Native Claims Settlement Act, Pub.L. No. 92–203, 85 Stat. 688 (codified as amended at 43 U.S.C. §§ 1601–1629a (1982)) (ANCSA). Section 19(a) of ANCSA revoked the Executive Order creating the Tetlin Reserve (among others) while Section 19(b) allowed village corporations to elect to receive fee simple title to their former reserves in lieu of other benefits from ANCSA. 43 U.S.C. § 1618(a), (b) (1982). Tetlin Native Corporation was incorporated in July 1973 and elected to receive fee simple title to its former reserve and forego participation in the monetary settlement authorized by ANCSA.

In early 1980 the BLM released for comment a draft decision determining lands available for conveyance to Tetlin. The draft decision provided that the grant of the former reserve would be subject to the five BIA material site easements at issue as well as four material site easements granted by the BLM.

Shortly after the draft decision was released the director of the BLM for Alaska wrote to the regional solicitor asking for an opinion on the validity of the five BIA material site easements identified in the draft decision. The solicitor informed the director that the five material sites granted to the State by the BIA were invalid. The solicitor reasoned that: "[s]ince Tetlin is not an Indian Reservation, the jurisdiction to dispose of gravel is under the BLM. The provisions of 43 C.F.R. § 2802.1–6 [(1979)] giving BIA jurisdiction over rights-of-way on 'Indian [lands]' and of 25 C.F.R. § 161.3 [(1979)] do not apply in this case."

On September 30, 1980, the BLM issued its final decision conveying to Tetlin approximately 743,000 acres of land. The final decision deleted reference to the five material site easements granted to the State by the BIA. Although the final decision no longer made the grant specifically subject to the five material sites, it did contain a general savings clause for valid existing rights.[7]

In accordance with Department of Interior regulation 43 C.F.R. 2650.7 (1980), the final decision expressly stated that:

> Any party claiming a property interest in lands affected by this decision, an agency of the Federal government, or regional corporation may appeal the decision to the Alaska Native Claims Appeal Board,
>
> . . .
>
> . . . .
>
> Any party known or unknown who is adversely affected by this decision shall be deemed to have waived those rights which were adversely affected unless an appeal is timely filed with the Alaska Native Claims Appeal Board.

Neither the State nor Tetlin appealed any issue relating to the BIA material sites. On May 18, 1981, the Secretary of the Interior conveyed by patent to Tetlin the surface and subsurface estates to the lands identified in the final decision.

Sometime after the patent was issued the State informed Tetlin that the State claimed all the right, title and interest to the five BIA issued material site easements. Tetlin filed suit to challenge the State's claim to the material site easements. Among other things, Tetlin's complaint sought declaratory relief that the State had no right, title or interest in the five BIA material sites. Both parties moved for summary judgment on this issue.

The trial court granted summary judgment in favor of the State and denied Tetlin's cross-motion for partial summary

---

Indian tribes, communities, bands, or nations ... and any other lands heretofore or hereafter acquired or set aside for the use and benefit of the Indians.

**6.** 25 C.F.R. part 161 has since been redesignated as part 169. 25 C.F.R. Redesignation Table (1982).

**7.** The savings clause provides in part:

The grant of the above-described lands shall be subject to:

1. Valid existing rights therein, if any, including but not limited to those created by any ... right-of-way, or easement, and the right of the ... grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him.

judgment. The court first determined that "[t]he State's failure to appeal the [BLM final decision] does not preclude the State from now insisting that its claim is valid." Upon reaching the merits the court concluded: "The material site grants were valid. The blanket reservation of valid pre-existing rights preserved the material sites for the State." Tetlin appeals.

## II. DISCUSSION

### A. THE STATE DID NOT WAIVE ITS RIGHT TO CLAIM AN INTEREST IN THE MATERIAL SITE EASEMENTS.

At the outset we note the issues raised in this case involve questions of law which we review *de novo. Alaska Sales and Serv. Inc. v. Millet,* 735 P.2d 743, 745 (Alaska 1987). Tetlin argues that the State may not now assert its claim to the easements because it did not appeal the BLM's decision which omitted the five material site easements from the final decision and patent. Tetlin argues that during the conveyance process the BLM adjudicated the validity of the BIA material site easements, and found them invalid. This is so, reasons Tetlin, because the draft decision referred to the material sites, a BLM solicitor opined that the easements were invalid, and the final decision did not refer to the easements.

The State argues that a brief memorandum by the solicitor is not an adjudication of the easements. Moreover, the State points out that it did not receive the solicitor's opinion, and that the BLM did not necessarily take the solicitor's advice because the final decision did not specifically cancel the material site easements. The State argues that the BLM's failure to adjudicate the sites does not translate into a waiver by the State of all rights to the sites. The State contends that the title conveyed by the patent remains subject to the material site until it is specifically cancelled.

Sections 14(g) and 22(b) of ANCSA, as well as BLM regulations governing the conveyance of land to Native corporations, have been interpreted as imposing a duty upon the BLM to determine the validity of third party interests created by the Federal government. 43 U.S.C. §§ 1613(g), 1621(b); 43 C.F.R. § 2650.3–1(a) (1987). *See Appeals of the State of Alaska and Seldovia Native Ass'n, Inc.,* 84 Interior Dec. 349, 379–80 (1977), *modified,* 85 Interior Dec. 1 (1977). Following the *Seldovia* decision, the Secretary of the Interior issued Secretarial Order (S.O.) 3029 [8] which stated in part:

> Clearly the administrative act of listing an interest as a valid existing right or of failing to list it does not create or extinguish the right. Because of this the ultimate validity of all interests may require court litigation.
>
> Nevertheless it is appropriate for BLM to determine in the first instance the validity of those interests which are created by federal law since BLM is in most cases the agency charged with the administration of those laws.

43 Fed.Reg. 55287, 55291 (1978), *amended,* 45 Fed.Reg. 1692, 1693 (1980). Decisions of the Alaska Native Claims Appeal Board [9] (ANCAB) indicate that when conveying land to Native corporations the BLM routinely adjudicates all federally created third party interests with two exceptions irrelevant to this appeal. *See, e.g., State of Alaska, Dep't of Transp. & Pub. Fac.,* 89 Interior Dec. 321 (1982) (air navigation site); *Appeal of State of Alaska,* 86 Interior Dec. 45 (1979) (road easement and material site state claimed it owned in fee). Given that adjudication of federally created interests is the BLM's policy, Tetlin argues that when the BLM fails to adjudicate a third party interest that party must appeal or lose the third party interest. *Cf. State of Alaska, Dep't of Transp. & Pub. Fac.,*

---

**8.** S.O. 3029 reaffirmed in pertinent part S.O. 3016, 85 Interior Dec. 1, 8 (1977).

**9.** The Alaska Native Claims Appeal Board was abolished and all Board functions transferred to Interior Board of Land Appeals by S.O. 3078. *See* 47 Fed.Reg. 26392 (1982); 43 C.F.R. 4.1(b)(3)(i).

88 Interior Dec. 629 (1981), *modified on other grounds*, 89 Interior Dec. 346 (1982) (easement omitted from conveyance, State appealed to have conveyance amended so it listed the easement).

We disagree. Both the ANCAB and the Secretary of the Interior agree that the administrative act of failing to list an interest does not extinguish that right. *See Seldovia*, 84 Interior Dec. at 379–80; S.O. 3029, 43 Fed.Reg. at 55291. The law is similarly in accord that a material site easement remains in effect until it is adjudicated invalid and specifically cancelled. *See* 25 C.F.R. § 169.20 (1987) (easement created pursuant to 25 U.S.C. § 323 terminable for failure to comply with terms, nonuse or abandonment).[10] *See also Southern Idaho Conf. Ass'n of Seventh Day Adventists v. United States*, 418 F.2d 411, 414–15 (9th Cir.1969).

■ We turn now to the circumstances of the instant case. The final decision deleted reference to the five BIA material site easements listed in the draft decision. Two possible reasons for the difference between the draft and final decisions exist. First, the BLM may have neglected to include the material sites through inadvertence. If that is the reason for failing to list the easements then the easements are not extinguished and the State may assert its claim to the easements.

Alternatively, the BLM may have reasoned that it adjudicated the easements and deleted reference to them because it found the easements invalid. If adjudication was the basis of omitting the easements, we conclude that the easements were not properly adjudicated so as to bar the State from claiming an interest in them.

The issue of the adequacy of the adjudicative process pursuant to S.O. 3029 was raised in *Northway Natives Inc.*, 88 Interior Dec. 14, *aff'd in part, modified in part*, 88 Interior Dec. 711 (1981). There, the ANCAB held that merely reviewing the case file to see if the rights-of-way had been issued and had not been cancelled was insufficient adjudication when the record before the BLM raises questions about the validity of federally created interests. We agree.

Under the Administrative Procedure Act when an adjudication is required there must be notice and a hearing. *See* 5 U.S.C. §§ 554, 556, 557 (1982). Moreover, because the easements are property interests which can only be cancelled for cause, holders of such interests are entitled to due process before those interests are extinguished. *See Pence v. Kleppe*, 529 F.2d 135, 141 (9th Cir.1976). An "elementary and fundamental" requirement of procedural due process is notice reasonably calculated to inform interested parties of action affecting their property rights. *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950).

■ Secretarial Order 3029 requires an adjudication of federally created interests as part of the ANCSA conveyance process. It is undisputed that the BLM neither held a hearing nor gave notice to the parties that it was determining the validity of the five BIA material sites. We refuse to conclude that an unpublicized exchange of memoranda between the state director of the BLM and the regional solicitor is an adjudication. Thus, where a patent contains a general savings clause for valid existing rights, the patentee takes subject to those rights until they are properly adjudicated invalid and specifically canceled. *Cf. State v. Alaska Land Title Ass'n*, 667 P.2d 714, 722 (Alaska 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 168 (1984) (patentee takes subject to previously established right-of-way where the instrument is silent as to the existence of the right-of-way). Accordingly, the trial court properly found that although the State did not appeal the final decision, the State did not lose its right to assert a claim to the material site easements.

---

**10.** At the time the easements were created 43 C.F.R. 2234.1–4(b)(2) (1964 Supp.) provided that "rights-of-way are subject to cancellation" for failure to construct, abandonment or non-use. In addition, 43 C.F.R. 2234.1–5 (1964 Supp.) provided that "[n]o right-of-way shall be deemed to be cancelled except on the issuance of a specific order of cancellation."

## B. TETLIN IS ESTOPPED TO DENY THE VALIDITY OF THE MATERIAL SITE EASEMENTS.

■ The primary issue raised by the cross-motions for summary judgment is whether the BIA material sites were validly created rights-of-way. If the material site easements are invalid then Tetlin is not "subject to" those easements held by the State. The State argues Tetlin should be estopped from denying the validity of the material sites. The trial court did not rule on the estoppel argument. We nonetheless consider this argument because any ground may be urged on appeal to support a judgment even if it was not accepted by the trial court. *State v. Alaska Land Title Ass'n,* 667 P.2d at 725; *Moore v. State,* 553 P.2d 8, 21 (Alaska 1976).

■ Tetlin's interest in the material site easements is derived from the federal government through the 1981 patent. 43 C.F.R. 2650.4–2 (1987) ("Upon issuance of any conveyance under [ANCSA] the grantee shall succeed and become entitled to any and all interests of ... the United States as ... grantor.") Accordingly, Tetlin stands in the shoes of the federal government with respect to being estopped.

Generally, the "United States [government] is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791, 818 (1917). Nonetheless, the government may be estopped where "the interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their government" outweigh "the public interest in ensuring that the Government can enforce the law free from estoppel...." *Heckler v. Community Health Services of Crawford County,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42, 52 (1984). *See also United States v. Locke,* 471 U.S. 84, 89 n. 7, 105 S.Ct. 1785, 1789 n. 7, 85 L.Ed.2d 64, 73 n. 7 (1985) (Court remanded the case for the purpose of allowing the district court to determine if the govern-

ment should be estopped from invalidating and extinguishing miner's property interests based upon an erroneous pamphlet issued by the BLM).

"Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler,* 467 U.S. at 59, 104 S.Ct. at 2223, 81 L.Ed.2d at 51. Courts have been willing to estop the government from invalidating interests in the public lands where claimants have reasonably relied on erroneous information from government agents. *See, e.g., United States v. Wharton,* 514 F.2d 406, 412 (9th Cir.1975) (where BLM official told family there was no way to gain title to land when it was still possible to gain title by filing a new application, estoppel applied against the government in part because "[g]overnmental conduct would work a serious injustice if this family were divested of the home in which they have invested so much of themselves."); *Tosco Corp. v. Hodel,* 611 F.Supp. 1130, 1207 (D.Colo.1985), *vacated as moot,* 826 F.2d 948 (10th Cir.1987) ("It would indeed run afoul of the 'basic fairness of the administrative decision making process' to now allow the department to repudiate 28 years of action and attempt to invalidate these claims...."). We have recognized that in certain cases the government should be estopped to "retroactively [ ] invalidate the deliberate actions of its officers after they have been reasonably relied on for 34 years." *State, Dep't of Transp. v. First Nat'l Bank of Anchorage,* 689 P.2d 483, 486 n. 13 (Alaska 1984).

The doctrine of estoppel against the federal government contains the following traditional elements: (1) the party to be estopped must know the facts; (2) he or she must intend that his or her conduct shall be acted on; (3) the party claiming estoppel must be ignorant of the true facts; and (4) that party must rely on the adversary's conduct to his or her injury. *United States v. Ruby Co.,* 588 F.2d 697, 703 (9th Cir. 1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). Most federal courts have added a fifth element which requires that the government's action constitute "affirmative misconduct." *Id.;*

*Tosco Corp.,* 611 F.Supp. at 1202 (cases cited therein).

We are bound by federal principles of estoppel because this case concerns *"whether* a title to land which had once been the property of the United States has passed [out of federal control]." *Oregon v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 377, 97 S.Ct. 582, 590, 50 L.Ed.2d 550, 50 L.Ed.2d 550, 562 (1977) (citing *Wilcox v. Jackson,* 13 Pet. 498, 517, 10 L.Ed. 264, 273 (1839)) (emphasis in original). Applying the estoppel test to the case at bar we conclude that Tetlin as successor in interest to the federal government is estopped to deny the validity of the material site easements.

In 1961 the Department of the Interior through the BLM denied the State's application for a material site within the Tetlin Indian Reserve advising that the State apply to the BIA. In 1964, upon application to the BIA, the BIA granted the State five material site easements. Neither the BLM nor BIA acted hastily in their decision making. Before issuing the material site easements the BIA requested and obtained the consent of the Tetlin Native Council. The BIA also calculated and approved "adequate" damages which the State paid to the council for the material site. Both the BLM and BIA recognized that the Tetlin Reserve was created by Executive Order 5365. In light of these circumstances it is clear the government knew the facts.

It is also clear the BIA and BLM intended their conduct to be acted upon by the State. The BLM directed the State to apply to BIA. The BIA granted the material site easements intending the State to use the sites to construct and maintain the Alaska Highway.

With respect to the third element we find the State was ignorant of the "true" facts. In *Tosco* the district court implicitly concluded that "true facts" under certain circumstances also includes true interpretations of law. *See Tosco Corp.,* 611 F.Supp. at 1204. In *Tosco* oil shale claimants failed to perform annual assessment work in reliance upon Department of the Interior interpretations of applicable regulations and caselaw. In discussing the true facts element the Colorado District Court wrote:

We also find that these claimants were ignorant of the "true" facts and were thus entitled to rely on the department's conduct between 1935 and 1960. As a general rule, persons dealing with the government are charged with knowledge of and are bound by statutes and lawfully promulgated regulations, despite their reliance on incorrect information received from government agents. This rule has less impact, however, when those persons are dependent upon a governmental agency to interpret its own complex body of rules and regulations.

Plaintiffs, as oil shale claimants, are among the class of persons most dependent upon the department's interpretations and statements with respect to the mining laws. The language of [*Wilbur v. U.S. ex rel.*] *Krushnic*[, 280 U.S. 306, 318, 50 S.Ct. 103, 105, 74 L.Ed. 445 (1930)] and [*Ickes v.*] *Virginia–Colorado* [*Development Corp.,* 295 U.S. 635, 55 S.Ct. 888, 79 L.Ed. 1627 (1934)] upon which the department based its 1935 decision, was not susceptible to easy interpretation, ... The department believed those decisions foreclosed its authority to proceed against oil shale claimants for their failure to perform annual assessment work. When the department continued to act in accordance with its interpretation for the next 28 years, oil shale claimants were entitled to rely on the department and cannot now be charged with the knowledge that the interpretation was erroneous.

611 F.Supp. at 1204 (citations omitted).

Similarly, jurisdiction over Native land in Alaska is, even today, an unsettled area of law. Persons dealing with interests affecting Native land are dependent upon the interpretations of the government agency charged with administering Native land and the accompanying complex body of rules and regulations. Although BLM initially granted the State at least one material site easement within the Tetlin Reserve, sometime in 1961 the BLM changed its position concerning which agency had juris-

diction to grant such easements. In 1980 the BLM determined that it erred in 1961. We decline, however, to charge the State with knowledge that BLM's original interpretation, rather than its 1961 change in interpretation, was the "true" interpretation.[11]

With respect to the reliance element there is no doubt the State relied upon the actions of the Department of the Interior. When the BLM denied the easement it gave the State a choice of two administrative remedies: appeal or apply to another agency. The State chose to apply to another agency and as a result it received the desired easements from the BIA. Because the State achieved its desired goal through one of two alternative administrative remedies presented by the BLM, the State's reliance upon the BIA's authority was reasonable. The State further relied upon the material site easements by removing gravel and using the gravel to improve the Alaska Highway.

Finally we must determine whether the government's conduct is "affirmative misconduct" as construed by the courts. Decisions of the Ninth Circuit suggest that "affirmative misconduct requires" more than mere negligence. *TRW, Inc. v. Federal Trade Comm'n,* 647 F.2d 942, 951 (9th Cir.1981); *United States v. Ruby Co.,* 588 F.2d at 704. We are persuaded by Chief Judge Finesilver's interpretation of affirmative misconduct in *Tosco,* where he states:

In this case, the ALJ [Administrative Law Judge] concluded that the department's conduct between 1935 and 1960 was the result of a mistake of law and could not be characterized as misconduct. The ALJ's conclusion reflects too narrow a view of the law of estoppel, even as it applies against the government. It must be remembered that estoppel is an equitable doctrine which requires the judicial consideration of the relative equities of the parties....

In addition, we do not believe that the Supreme Court, in suggesting "affirmative misconduct" as an element of estoppel, intended that a government agent must engage in an intentional misrepresentation or concealment before his conduct could estop the government. Such a requirement would be irreconcilable with the Court's long-standing rule that the government cannot be estopped by the unauthorized conduct of its agents. It is hard to imagine a situation where the conduct of an agent can be both intentionally tortious *and* authorized by the government. Therefore, we conclude that for the estoppel doctrine to be applied against the government, the conduct must be within the scope of the agent's authority and must be an affirmative act which, on a balance of all the equities, amounts to "unconscientious or inequitable" behavior. Assuming all other elements of estoppel are present, ... even conduct based on a mistake of law will qualify as "affirmative misconduct" if the refusal to estop the government will work an inequitable or unjust result.

611 F.Supp. at 1205–06 (citations omitted; emphasis in original).

In the case at bar, the actions of the Department of the Interior in both denying and granting easements constitute authorized affirmative conduct. The State has relied on the grants for over 20 years. Equity prevents an agency from redetermining the validity of a grant where a "serious injustice would be worked and the public's interest would not be unduly damaged by the imposition of estoppel." *See*

---

11. The dissent argues that the State has not satisfied the requirement of ignorance of the true facts because it had the means of acquiring the pertinent knowledge but did not do so. *See City of Long Beach v. Mansell,* 3 Cal.3d 462, 91 Cal.Rptr. 23, 33, 476 P.2d 423, 433 (1970). In *Mansell* the California Supreme Court further explained that a person need not "be destitute of all possible means of acquiring knowledge ... but rather of all convenient or ready means to such end." *Id.* 91 Cal.Rptr. at 43–44, 476 P.2d at 443–44. For the State to learn which interpretation was the "true interpretation" the State would have had to have engaged in litigation by appealing the BLM's decision through the agency and courts. The State chose the more convenient method of applying to another agency. We believe this conduct satisfies the State's acquisition of knowledge obligation. We do not believe, in this context, that the onus was on the State to resolve jurisdictional conflicts between federal agencies.

*United States v. Lazy FC Ranch,* 481 F.2d 985, 989 (9th Cir.1973).

An injustice would be worked if Tetlin were permitted to contest the validity of the material site easements since the United States government no longer owns the land and cannot, therefore, re-issue the easements. The public's interest would be damaged if the State no longer had access to the material sites for road maintenance purposes. In contrast, imposition of estoppel will not unduly damage Tetlin. When the BIA granted the easements it followed procedures designed to protect and compensate the people then living on the Tetlin Indian Reserve. The land comprising the reservation now constitutes the land owned by Tetlin Native Corporation. This land is benefited by the portion of the highway which crosses it. Further, Tetlin as successor-in-interest to the Federal Government has the power to terminate the material site easements if the State abandons or discontinues the use for which the sites were granted. 25 C.F.R. § 169.20 (1987). We therefore conclude that the Department of the Interior's conduct in granting the easements is sufficient misconduct to justify estoppel because refusal to estop the government and Tetlin will work an inequitable and unjust result.

In light of the equities involved, we conclude Tetlin is estopped to challenge the validity of the five material sites.[12]

### III. CONCLUSION

The decision of the trial court is AFFIRMED.

RABINOWITZ, Justice, dissenting.

The majority, citing *United States v. Ruby Co.,* 588 F.2d 697, 703 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), lists five elements that must be found in order to justify invocation of the equitable doctrine of estoppel. Those factors are:

1) the party to be estopped (Tetlin) must know the facts;

2) that party must intend that its conduct shall be acted upon;

3) the party claiming estoppel (the state) must be ignorant of the true facts;

4) that party must rely on its adversary's conduct to its detriment; and, in the case of estoppel against the government,[1]

5) the action of the party to be estopped must constitute "affirmative misconduct."

The superior court made no ruling on the estoppel issue. The majority, however, concludes that each of the elements of estoppel has been satisfied, and that Tetlin is therefore estopped from denying the validity of the material sites. In my opinion this conclusion is incorrect because the third and fourth elements of estoppel have not been satisfied.

While the state may well not have known whether "BLM's original interpretation, rather than its 1961 change in interpretation, was the 'true' interpretation," it did know the following facts: that it had submitted two virtually identical applications to BLM within four days of each other; that BLM granted one application; that BLM rejected the other application, stating that it lacked authority over the site because it was on the Tetlin Indian Reserve, and suggesting that the application be submitted to BIA; that the decisions on its two applications were inconsistent; that it did not submit the application which BLM rejected to BIA;[2] and that it had not appeal-

---

**12.** Tetlin argues that there are material issues of fact which should have prevented the court from granting summary judgment. There is no evidence in the record supporting Tetlin's factual allegations. We therefore conclude there are no factual issues preventing the trial court from granting the State's summary judgment motion. *See* Alaska R.Civ.P. 56(e).

**1.** The majority opinion notes that "Tetlin's interest in the material site easements is derived

from the federal government through the 1981 patent.... Accordingly, Tetlin stands in the shoes of the federal government with respect to being estopped."

**2.** I am not persuaded that the state chose "one of two alternative administrative remedies presented by the BLM"—i.e. that it submitted its rejected application to BIA. Rather, by waiting a year and a half, and then including an application for the site rejected by BLM in a group of

ed the inconsistent decisions. As Tetlin argues, "the State chose the expedient route of ignoring the problem."

The majority holds that because the state did not know which of the decisions concerning its applications was the "true" interpretation by BLM of the governing regulations, the state satisfies the third criterion for estoppel (ignorance of the true facts). But the state was not ignorant of the facts; it merely was ignorant of the proper resolution of the ambiguous situation created by those facts. The California Supreme Court, explicating the elements of estoppel, has noted that to satisfy the element of ignorance of the true facts "the ... party [claiming estoppel must be] not only destitute of the true [facts], but of the means of acquiring such knowledge." *City of Long Beach v. Mansell,* 3 Cal.3d 462, 91 Cal.Rptr. 23, 43, 476 P.2d 423, 443 (Cal.1970) (quoting *Biddle Boggs v. Merced Mining Co.,* 14 Cal. 279, 367 (Cal.1859)). Not only did the state have knowledge of the facts, but it could have obtained a determination as to which of the contradictory decisions it had received was correct by appealing to BLM or immediately submitting an application to BIA. A "convenient and ready means to such end," *Mansell,* 91 Cal.Rptr. at 44, 476 P.2d at 443–44, was thus available to the state. It chose not to take advantage of that opportunity. Thus, it can not now claim that it was ignorant of the true facts and is therefore entitled to estop Tetlin.

The fourth element of estoppel is the state's reliance on the BIA grants of the material sites. In my view that reliance was not reasonable in light of the facts noted above. The state knew that BLM had made contradictory decisions concerning the state's two applications. Rather than seek a resolution of this situation, however, the state was content to keep its

applications to BIA, the state took no steps to resolve the problem presented by BLM's inconsistent treatment of its site applications.

**3.** As the Ninth Circuit has noted:

> Generally, the existence of estoppel is a question for the trier of fact. However, if the facts are not disputed, and only one inference can be drawn from the evidence, the question of

BLM-granted site, and years later, to include the rejected site in a group of applications to BIA. Knowing that either BLM or BIA had authority to grant the material sites, and knowing that it had sites granted by BLM and sites granted by BIA, it was not reasonable for the state to assume that the BIA-granted sites were valid. The state realized that there was uncertainty as to which agency had authority to grant the material sites and the state had the means of acquiring the knowledge of the true facts (i.e. which agency had the authority to grant the applications in question). The state's decision not to ascertain which agency could properly grant the material sites renders its "reliance" on BIA's authority to grant them unreasonable.

Because the state was not ignorant of the true facts, and because its reliance on the validity of the BIA grants was not reasonable, it has not fulfilled the requirements for estoppel, and summary judgment for the state on that issue is improper.

On the other hand, since the state had a duty to seek clarification of the ambiguous situation resulting from the decisions on its applications to BLM, and the state did not do so, the state cannot now estop Tetlin from contesting the validity of the material sites. Therefore I would grant summary judgment in favor of Tetlin on the estoppel issue.[3]

estoppel becomes one of law.... [I]n this case ... we find there to be no material facts in dispute and thus conclude that the question of estoppel is properly resolved at this time as a matter of law.

*Sawyer v. County of Sonoma,* 719 F.2d 1001, 1006 n. 12 (9th Cir.1983) (citations omitted).